Petition of M. & J. TRACY, INC., as owner of the BARGE HERBERT E. SMITH for Exoneration from or Limitation of Liability.

**Charles Prasnal, Claimant, Appellant.**

No. 17603.

United States Court of Appeals Third Circuit.

Argued Sept. 16, 1969.

Decided Dec. 29, 1969.

As Amended and Rehearing Denied April 6, 1970.

---

Wilfred R. Lorry, Freedman, Borowsky & Lorry, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Borowsky & Lorry, Philadelphia, Pa., Joseph T. Karcher, Karcher & Reavey, Sayreville, N. J., on the brief), for appellant.

Edward R. Schwartz, Michels, Schwartz & Maher, Newark, N. J. (Michels, Schwartz & Maher, Newark, N. J., Bigham, Englar, Jones & Houston, New York City, Herman D. Michels, Newark, N. J., John Shields, New York City (of the New York Bar), on the brief), for appellee.

Before BIGGS, KALODNER and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The appeal at bar presents a narrow issue. Prasnal, the claimant-appellant, an employee of Seaboard Coal Dock Co., sued M. & J. Tracy, Inc., the owner of the Barge "Herbert E. Smith", and others on April 11, 1964, alleging that he was injured because of the unseaworthiness of the barge and its negligent operation by Seaboard allegedly acting in privity with Tracy. On August 25, 1965 Tracy filed a petition for exoneration from liability or for limitation of liability to the value of the barge, stipulated to be $38,000, pursuant to 46 U.S.C. §§ 181–189. The court below granted Tracy's petition for exoneration from liability.[1] The appeal at bar followed.

The substantial basis for Prasnal's appeal rests on his contention that the barge was unseaworthy because of operational negligence.[2] Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743 (1967). The gist of the trial court's decision[3] on this issue is contained in the following statement in its opinion: "Claimant in this case, however, has not established that there was any negligence involved in the manner in which the barge was pulled up to the dock. While, in the ordinary case, negligence may be presumed where a vessel collides with a stationary object, Patterson Oil Terminals v. The Port Covington, 205 F.2d 694 (3 Cir. 1953), that is not the case here. Witnesses for both sides testified at trial that having the barge bump into the dock was a common practice, not only at the Seaboard dock, but elsewhere as well; and testimony by petitioner's experts proved that the practice is a seaworthy one. Claimant here has not shown that the barge was pulled with an undue amount of force causing it to crash violently into the dock. At most, the witnesses testified it was moving 'fast' but the evidence clearly establishes that the barges had hit the dock many times with approximately the same force. Claimant, therefore, has not proven that the

---

1. The privity or knowledge issue was not decided by the court below in view of its conclusion that the barge was seaworthy and that there was no negligent operation in docking it.

2. The claimant has asserted in his answer to the petition for exoneration numerous grounds of negligence. Some of these relate to alleged unsafe place to work be-

cause of the lack of proper handrails around the perimeter of the boat and somewhat similar contentions which need not be detailed here. However, in his brief and in his oral argument the claimant seems to rest on the ground stated in the body of this opinion.

3. The case was tried to the court.

practice was not a reasonably safe one to use in positioning the barge."[4,5]

■ It is hornbook law since the decision in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), that in a suit in admiralty tried without a jury the scope of review of an appellate tribunal is no greater than that which it can exercise under Rule 52, Fed.R.Civ. Proc., 28 U.S.C., and that a reviewing court may not set aside the judgment unless it is "clearly erroneous". This is the decisive issue on this aspect of the appeal.

What occurred in connection with Prasnal's accident according to the findings of fact by the court below follows: "At approximately 5 p. m., on April 11, the procedures to shift the barge under the dumper were begun and Prasnal and Fritz Jakubczak, another Seaboard employee, boarded the barge. Captain Gomes was at that time in his cabin on the barge, and remained there throughout the shifting operation. Jakubczak secured the west winch cable to the port stern deck cleat, and then the lines securing the Herbert E. Smith to the adjacent barge were cast off. After receiving the signal to go ahead, the dock winch operator, John Bloodgood, using the west cable, pulled the barge in toward the dock, then let the line go slack, allowing the barge to drift into, and collide with, the dock. When the barge hit the dock, Prasnal landed feet first on the dock, then fell backwards into the water and was injured."[6,7] Prasnal fractured bones of both feet and both ankles.

4. The opinion was not reported for publication.

5. The procedure used in docking the Herbert E. Smith, as found by the court below, was as follows: "The procedure used to move an empty barge under the dumpers, without the use of a tugboat, was as follows: Two shore employees would board the barge to handle the lines and the cable from the west side of the winch house would be drawn through the dock pulleys, taken aboard the end of the barge and secured to a deck cleat. The winch operator, who proceeded on his own after he received the go-ahead signal, would then take up on the cable drawing the barge toward the dock and the dumper. After the barge was in movement, the cable would be slacked off and, while the barge continued drifting, the cable end would be removed from the cleat on which it had been secured and carried to the other end of the barge and placed on a cleat there. After the barge reached the dock, the other cable, from the east side of the winch house, would be drawn through the dock pulleys at the east end of the dock and taken aboard the barge to secure the other end. During the barge's movement towards the dock, other dock laborers would be prepared to receive lines from the two men on the barge, and throw lines to them so that the vessel could be drawn into and parallel with the side of the dock, and secured to the dock after it was properly positioned."

6. The Herbert E. Smith had been fastened longitudinally to another barge which was docked. The accident in which Prasnal was injured occurred during the process of bringing the Herbert E. Smith under the dumper so that it could be loaded with coal.

7. The following correct description of the barge is taken from the "Findings of Fact" of the trial court:
"The Herbert E. Smith is an 885 ton hopper-type barge, constructed of steel in 1952, in accordance with the standards of the American Bureau of Shipbuilding classifications for a harbor barge. With a cargo capacity of 2300 tons, the barge is 146 feet long, 38 feet wide and 17½ feet deep. Petitioner received a certificate of classification for the hull from the American Bureau of Shipbuilding in 1952, and its standards of safety of construction meet those set by the shipping industry. The barge is equipped with a steel coaming around the cargo hopper, which is four feet nine inches above the level of the deck. Extending the length of the coaming is a hand-rail forty-two inches above the deck. Between the gunwale and the coaming are 42 inch-wide starboard and port decks constructed of safety tread, slip-resistant steel with diamond shaped protrusions. Extending around the outside perimeter of the deck, except for spaces where the cleats are, is a toe rail that is approximately three inches high. At the stern of the barge is a small cabin, and around the cabin is another hand-rail. The fair market value of the barge is $38,000."

It will be observed that in the foregoing quotation the learned trial Judge made no finding as to whether Prasnal was thrown from the barge by the force created by the barge colliding[8] with the dock. He did not, however, find to the contrary. There is no evidence in the record that Prasnal tripped or fell from the barge to the dock, the deck being approximately seven feet above the dock. There is a small mystery in the record before the district court insofar as an injury to Garsick, a dock employee of Seaboard, is concerned. Garsick had his arm broken by a line from the Herbert E. Smith[9] at the time that the Smith was being docked and Prasnal was injured. There is no mystery concerning the fact, however, that the Smith, which was empty, weighed approximately 364 tons and there is ample evidence, in fact substantially uncontroverted evidence, that the Smith was moving, on the occasion of Prasnal's injury, not as the trial court found in the paragraph last quoted but with much greater force.[10] Common sense would lead one to doubt that except in very calm weather there could be any reasonably accurate approximation of the speed at which a barge like the Smith would approach the dock impelled by a line attached to a winch. This is so because of the wide variances which almost constantly attend changes in the forces of wind and tide. We emphasize the fact that the docking of the Smith by the process used by Seaboard necessarily placed the barge in an uncon-

trolled and uncontrollable state once the impulse toward the dock had been put upon it. The fact that the process seems to have been one generally used for the docking of barges without tugs does not sanctify it. Cf. Petition of Oskar Tiedemann & Co., 179 F.Supp. 227 (D.C.1959), aff'd., 289 F.2d 237 (3 Cir. 1961). Whether the process was a safe or dangerous one must depend necessarily upon the circumstances of each case. We find this argument of Tracy's unconvincing.

A scrutiny of the transcript of testimony discloses that the Smith's Captain, Gomes, testified that he was instructed not to handle lines when the Smith was being docked at South Amboy or Seaboard docks. Captain Gomes also stated on cross-examination by Prasnal's counsel: "I hear when the boat hit the dock so I have to press [sic.] myself."

Further cross-examination elicited the following from Gomes:

"A. While it [the Smith] was moving was it under proper control?

Q. Yes.

A. Well, it was pulling pretty hard.

Q. They were pulling it pretty hard?

A. Correct.

Q. By that you mean pretty fast?

A. Fast.

*    *    *    *    *    *

Q. I think you indicated, and the record could show it, of course, that when this barge hit the dock you were

---

8. The trial Judge's opinion was not reported for publication. He did, however, use the word "collide": vide, "After receiving the signal to go ahead, the dock winch operator, John Bloodgood, using the west cable, pulled the barge in toward the dock, then let the line go slack, allowing the barge to drift into, and collide with, the dock. When the barge hit the dock, Prasnal landed feet first on the dock, then fell backwards into the water, and was injured." (Emphasis added). Perhaps the trial Judge did not use the accurate language and we do not desire to attempt to make this opinion a lesson in semantics. We point out, however, that the word "collide" means "to strike or dash against each other; to come into

collision; to clash; as, their interests collided—v. t. to strike or dash against. Obs." Webster's International Dictionary, 2nd ed. The word itself implies force.

9. Garsick's deposition is before this court, having been handed up as part of the record, but it was not before the court below. Garsick testified at the trial but on his examination in chief Prasnal's counsel asked only questions as to whether or not the barge was equipped with protective lines or railings around its perimeter.

10. There was an offshore wind from the north. There is no evidence respecting the velocity of this wind.

thrown against the bulkhead of your deckhouse, weren't you?

A. The cabin.

Q. Against the bulkhead of the cabin?

A. That's right.

Q. Isn't that called the deckhouse, also? Isn't that the deckhouse?

A. The deckhouse, right.

Q. And I think some things were knocked off the table in the cabin, weren't they?

A. Yes, things I had inside there that was loose were all knocked on the floor.

Q. Did you catch yourself when you were knocked against the bulkhead?

A. Yes, I did hold myself.

Q. You weren't hurt, were you?

A. No, I wasn't.

Q. Was that the first time that ever happened to you?

A. Not the first time.

Q. It happened many times, hadn't it?

A. Many times."

Prasnal's witness Dunagan, an extra operator and repairman for Seaboard, who observed Prasnal's accident and was less than one hundred feet from where he was injured, testified on direct examination as follows:

"Q. Will you describe the nature of the blow when the bow of the barge Herbert E. Smith hit the bulkhead of the dock?

A. It hit very hard, and I could feel the vibrations in the recorder's shanty when the boat hit.

Q. What happened to Charles Prasnal as it hit the dock?

A. He got thrown off by the force of it hitting the dock, knocked him off.

Q. Where were you looking when he was knocked off the barge?

A. I was looking directly at him.

Q. And after he was knocked off the barge where did he land?

A. He landed on the edge of the dock, flatfooted, as if he was standing, and then fell backwards into the water.

Q. Between the barge and the bulkhead of the dock?

A. Yes, sir."

He also stated that the barge "bounced back when it hit the dock". On cross-examination by Tracy's counsel, Dunagan testified:

"Q. You said the boat hit; do they usually bump, or does it bump occasionally?

A. It bumps, but this one slammed.

Q. This one slammed?

A. I don't know how fast the boat was moving in towards the dock, but I saw the bow end come in very fast.

Q. In other words, the bow end came around fast?

A. Yes.

Q. You are not suggesting to the Court that the boat itself was moving that fast?

A. No.

Q. And you are not suggesting—because you didn't see whether the stern hit that fast?

A. I didn't see the stern hit.

Q. How did you observe it hit with such more force?

A. I was watching Charlie Prasnal; I don't know, I was just sitting there watching and I saw this happen, I saw the bow end come in real fast and Charlie went off.

Q. How did he go off?

A. Just if you are standing straight on two feet, that would be the way he went off the boat, and that would be the way he landed."

The testimony of Bloodgood, an employee of Seaboard and the man who was running the winch which pulled the Smith into the dock, does support

**934**

Tracy's position. He stated in respect to the docking of the barge, as follows:

"Q. How did it [the Smith] come in?

A. It come in, drifted right in.

Q. Did it come in on a speedy drift or go right, or what?

A. No, it come in on a little angle and then the stern man throw the line on the dock.

Q. Did you observe or feel the boat hit the dock with a vibration that vibrated you?

A. No, I can't say that.

Q. How far away were you from the dock?

A. I am about four foot."

It must be borne in mind that Prasnal, who was on the Smith to aid in the docking, was either standing or walking on a 3½ foot wide runway. As indicated Tracy has laid much emphasis upon the usual process of docking without a tug, but as we have stated, all the pertinent circumstances in this case must be considered and weighed by the trial court.

■ We apply Mr. Justice Reed's statement in United States v. U. S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948): "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." We have the definite and firm conviction that a mistake was committed by the district judge in sustaining Tracy's petition for exoneration; there was negligence in operation here.

■■ As a second ground for reversal, Prasnal insists that the court below committed prejudicial error in rejecting certain testimony of his witness, Holland; in particular, the refusal to permit Holland to answer a hypothetical question as to the safety or lack of it in the procedure whereby the Smith was docked. A trial judge has broad discretion as to the admission or exclusion of expert testimony and if his ruling upon the admission of such testimony is to be reversed, it must be "manifestly erroneous". Salem v. United States Lines, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); Harris v. Afran Transport Co., 252 F.2d 536, 537 (3 Cir. 1958). We cannot say in this case that the exclusion of Holland's testimony was manifestly erroneous.

Other grounds raised by the parties need not be discussed in this opinion.

We hold that the court below erred in its conclusion that there was no negligence in the operation of the barge. We, of course, express no conclusions as to the issues of proximate cause, contributory negligence, or privity or knowledge, none of which was ruled on by the court below.

KALODNER, Circuit Judge (dissenting):

I would affirm the District Court's Decree and Order Granting Exoneration from Liability for the reasons so well stated in District Judge Coolahan's Opinion.