464 F.2d 1358
 4 ERC 1441, 2 Envtl. L. Rep. 20,495
 TRANSCONTINENTAL GAS PIPE LINE CORPORATION, a corporation of
the State of Delaware, Appellee, Public Service
Electric & Gas Company and South Jersey
Gas Company (Plaintiff Intervenors),
v.
HACKENSACK MEADOWLANDS DEVELOPMENT COMMISSION, a public
corporate body of the State of New Jersey, and
Clayson W. Foley, Appellants, et al.
 No. 71-2064.
 United States Court of Appeals,
 Third Circuit.
 Argued April 21, 1972.
Decided Aug. 2, 1972.
 
 Joseph M. Clayton, Deputy Atty. Gen., Trenton, N.J., for appellants.
 George W. McHenry, Jr., Federal Power Commission, Washington, D. C., amicus curiae.
 David B. Schackner, Fox, Schackner, Neagle & Mastrangelo, Newark, N. J., for appellee.
 Before ADAMS, MAX ROSENN and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge.
 
 
 1
 In this appeal, we are faced with the question of the extent to which a state may legitimately interfere with interstate commerce through the exercise of its police powers. In apparent conflict are the State of New Jersey's plans for the controlled development of its "Meadowlands District" and the right of a federally certificated natural gas company to expand its storage facilities on land acquired by it approximately five years before the enactment of the Hackensack Meadowlands Reclamation & Development Act, N.J.S.A. 13:17-1 et seq.
 
 
 2
 * Transcontinental Gas Pipeline Corporation ("Transco"), the appellee, is a natural gas company within the meaning of the Natural Gas Act ("Act"), 15 U.S.C. Sec. 717 et seq.,[1] and is thereby vested with various rights and powers as well as concomitant duties and obligations. Pursuant to authorization by the Act and the resulting periodic issuance of Certificates of Public Convenience and Necessity[2] by the Federal Power Commission ("FPC"), Transco has constructed and presently maintains an extensive pipeline system which gathers natural gas from onshore and offshore Gulf Coast locations, transports the gas through interstate commerce, and subsequently sells it to various distributors along the East Coast. Approximately seventy-five percent of the total amount of natural gas used in the state of New Jersey is supplied by Transco.
 
 
 3
 In 1963 Transco purchased from the New Jersey Borough of Carlstadt a five hundred acre tract of barren and undeveloped meadowlands for the purpose of constructing facilities for the processing and storage of Liquified Natural Gas ("LNG"). Subsequently the company acquired from the state, in return for settlement of pending litigation, any interests the state might have under disputed title.[3] After the FPC issued the necessary certificates, Transco constructed an LNG plant including an underground storage container. Soon after completion, however, engineering studies determined that the container, as constructed, would be unable to accommodate the full quantity of LNG for which it had been designed. In July of 1968, the FPC issued an amended certificate, authorizing the construction of an above-ground cylindrical storage container. The plant-including the aboveground container and appurtenant liquification and vaporization facilities-is presently in full operation.
 
 
 4
 In January of 1968, pursuant to the enactment of the Hackensack Meadowlands Reclamation and Development Act,[4] the Hackensack Meadowlands Development Commission ("Commission"), an autonomous, regional agency was established with the power to "adopt a master plan . . . for the physical development of all lands lying within the [Hackensack Meadowlands] District. . . ."[5] As stated in the Act, the area encompasses approximately 21,000 acres of saltwater swamps, meadows and marshes commonly known as "meadowlands" located in the lower Hackensack River Basin.[6]
 
 
 5
 The Transco property is located within one of the Commission's "Planning Areas," the company's existing facilities utilizing approximately sixteen acres of its five hundred acre tract.
 
 
 6
 In the fall of 1969, Transco was notified by its customers that additional LNG service would hence be required, especially during the peak winter season periods. To meet these demands, Transco applied to the FPC for authorization to construct a second above-ground storage facility. The construction would encompass an additional seven acres of the Transco property. As required by law, public notice of the application was published by the FPC and special notice given to the Governor and Public Service Commission of New Jersey. Neither the State, nor the Public Service Commission, nor the Commission petitioned to intervene or participate in any manner in the proceedings before the FPC although a number of Transco's customers were granted permission to intervene in support of the application. After a hearing the certificate was issued on March 12, 1970.
 
 
 7
 The Hackensack Meadowlands Reclamation and Development Act provides that a building permit must be obtained from the Commission prior to the commencement of any construction on land covered by the Commission's Master Plan.[7] After numerous meetings with Transco representatives, the Commission refused to issue the necessary permit, ostensibly on the grounds that the construction and operation of the proposed storage facility was not a "permitted use" under the Master Plan. The Commission concluded that to allow the proposed construction a variance would have to be issued. However, that, too, was denied, the Commission concluding that the construction would "seriously restrict the range of possible uses in the surrounding areas" and that it would "fail to meet applicable planning and safety regulations."[8] Nevertheless, after further negotiations, the Commission offered to "reconsider" its position upon the condition that Transco, inter alia, agree to abandon the entire plant by 1980.[9] Transco refused, contending that its obligations under the Natural Gas Act prohibited such an agreement.[10]
 
 
 8
 On July 22, 1970, Transco filed suit in the District Court to enjoin the Commission from interfering with construction of the facility. The Commission counterclaimed to enjoin commencement of construction. After six days of hearings, the District Court permanently restrained the Commission from interfering with construction of the facility.[11] The Commission appeals and we affirm.[12]
 
 II
 
 9
 It is well established that the interstate transmission and sale of natural gas is within the regulatory ambit of the Commerce Clause of the Constitution. Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); Federal Power Commission v. National Gas Pipeline Co., 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942). Although the states are not precluded from imposing reasonable restraints and restrictions on interstate commerce, and although the authority to enact zoning ordinances under the state's police power is clear, see, e. g., Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), it is equally settled that a state may not exercise that police power where the necessary effect would be to place a substantial burden on interstate commerce. Southern Pacific Co. v. Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).[13] We must therefore look to the particular facts presented by this case to determine whether the Commission's complete interdiction[14] of the proposed facility was a reasonable exercise of its police powers, or as the District Court determined, an "arbitrary, unreasonable and unjustifiable interference" with interstate commerce.
 
 
 10
 The Commission initially contends that the District Court's decision must be reversed for its alleged failure to consider adequately the "substantial public benefit" which will accrue to the Meadowlands area by the implementation of the Commission's Master Plan. Specifically, the argument is advanced that in determining whether or not an undue burden has been imposed upon interstate commerce, the District Court did not weigh sufficiently the reasons for the Commission's action. According to appellant, that action was adequately justified by the inherent benefits forthcoming to the area through strict adherence to the Master Plan. Our reading of the record, however, convinces us that the Commission's testimony was taken into consideration and, as indicated in the District Court's opinion, its viewpoint was, in fact, seriously weighed.
 
 III
 
 11
 The Commission argues that land surrounding the Transco site "has characteristics which will permit the establishment of higher uses than the heavy industrial character to which the proposed LNG facility would commit to the area" and that these planning goals are themselves a sufficient justification for the Commission's interference with interstate commerce. At the hearings and in its briefs to this Court, the Commission stated that these contemplated "higher uses" include the construction of a balanced residential community for 60,000 inhabitants in close proximity to the Transco site. However, the record reveals that if residential communities are in fact being considered, those plans are in the earliest stages of development and apparently thirty years in the future. In fact, it would appear that the only reasonably definitive plans for the development of the land surrounding the Transco site are-as counsel for Transco has contended without contradiction-the construction of a 750 acre sports complex consisting of two stadia, a race track, and various adjacent parking facilities. New Jersey Sports and Exposition Authority Law, N.J.S.A. 5:10-1 et seq.; see also New Jersey Sports & Exposition Authority v. McCrane, 61 N.J. 1, 292 A.2d 545 (1972).[15] The Sports Authority and the Commission apparently have joint responsibilities over this 750-acre tract.[16]
 
 
 12
 Counsel for appellant conceded at oral argument that the Commission's opposition was not directed solely at this proposed facility. Rather, he candidly admitted that appellant was primarily distressed by the prospect of further construction on the Transco property in the future and the Commission's inability to restrict such FPC-certificated construction. Notwithstanding these concerns, we affirm the District Court's conclusion that the Commission's actions were an unlawful interference with interstate commerce. Although we are cognizant of the tremendous importance of sound community and regional planning, see, e. g., E. B. Elliott Advertising Co. v. Metropolitan Dade County, 425 F.2d 1141 (5th Cir. 1970), we must also consider the needs of the New York-New Jersey metropolitan area for the adequate and efficient supply and delivery of natural gas. Upon this record and with full consideration of the state's interest in the Meadowland District, we conclude that the District Court's determination characterizing the Commission's action as "arbitrary," and an "unwarranted imposition upon interstate commerce" was correct.
 
 IV
 
 13
 The record reveals that the Commission had not promulgated any set of regulations, standards or criteria applicable to the construction of this type of industrial facility. It nevertheless concluded that the denial of the variance was "based mainly on the lack of conformity with applicable planning regulations and safety considerations."[17]
 
 
 14
 In the District Court extensive documentary evidence as well as testimony was presented by Transco, attesting to the safety of the proposed storage container. The Court found as a fact that the relevant Transco plans "conformed to all current building and safety standards." The Commission, however, does not accept this finding, asserts that it is against the weight of the evidence and argues that the District Court should be reversed.
 
 
 15
 Our standard of review is carefully circumscribed. On appeal, the District Court's findings of fact will not be set aside unless they are "clearly erroneous." F.R.Civ.P., Rule 52(a) Andrews v. Chemical Carriers, Inc., 457 F.2d 636 (3d Cir. 1972); Petition of M & J Tracy Inc., 422 F.2d 929, 931 (3d Cir. 1969).[18] After careful consideration, we conclude that none of the pertinent findings of the District Court are "clearly erroneous."
 
 
 16
 The testimony presented by Transco included that of Dale Hauser, the engineer in charge of the construction of the facility, who in considerable detail testified to the effect that the container met all existing safety regulations including those of the National Fire Protection Association and the American Petroleum Institution. It was uncontroverted that the specifications for the proposed facility not only complied with all existing safety standards relevant to the construction of such a facility but in fact included additional safety features suggested by Transco and the contractor-Pittsburgh-Des Moines Steel Company. In addition, William M. Nix, an engineer employed with an independent consulting firm, testified that the plans and specifications were "standard for the industry," included all safety factors and devices recognized and used in the industry, met the safety codes of all regulatory authorities and were in accordance with good engineering practices.
 
 
 17
 The Commission, however, contends that its expert witness, Marvin Salzenstein, presented testimony concerning the "possibility" of gas dispersion from the container, that this testimony was not refuted by Transco and that the District Court was therefore "entirely unjustified" in concluding that the Transco had in fact adequately rebutted Salzenstein's "damaging" testimony. The weight to be given expert testimony is in the province of the trial judge and will not be set aside, unless the "clearly erroneous" standard is met. United States ex rel. Carter Nelson, Inc. v. Campbell, 293 F.2d 816 (9th Cir. 1961); Evans v. United States, 319 F.2d 751 (1st Cir. 1963). We conclude that credible testimony of the Transco witnesses adequately rebutted the Salzenstein testimony and we therefore will not disturb the Court's findings on this point.[19]
 
 
 18
 To conclude, not only are the District Court's findings of fact not "clearly erroneous" but our review of the record mandates the conclusion that they are correct.[20]V
 
 
 19
 The National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. Sec. 4331 et seq., mandates that all executive and administrative agencies give good faith, careful and informed consideration to environmental values during the course of their decision making processes. See, e. g., Pennsylvania Environmental Council v. Bartlett, 454 F.2d 613 (3d Cir. 1971); Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971).[21]
 
 
 20
 Section 102, 42 U.S.C. Sec. 4332, contains the procedural provisions of NEPA. Of particular import to the present action is Subsection (C) which requires that to "the fullest extent possible" all federal agencies shall include a detailed environmental impact statement in "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment. . . ."[22]
 
 
 21
 This Court has held that NEPA should not be given retroactive application. Pennsylvania Environmental Council v. Bartlett, supra; Concerned Citizens of Marlboro v. Volpe, 459 F.2d 332 (3d Cir. 1972). We have not as yet been called upon, however, to decide whether strict compliance with NEPA is mandated immediately as of January 1, 1970, when NEPA first became effective. We conclude that in the particular circumstances of this case, the FPC was not required to file a Section 102 impact statement.
 
 
 22
 Section 4333 directs all Federal agencies to:
 
 
 23
 "review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter."
 
 
 24
 The facts of this case demonstrate clearly why a flexible approach to NEPA should be taken. It is undisputed that Transco submitted its application for certification in December of 1969, that the stated "effective date" of NEPA was January 1, 1970 and that the FPC certificate was issued on March 12, 1970. Neither the FPC nor the Council on Environmental Quality ("CEQ") had as yet promulgated any guidelines whatsoever, the CEQ's Interim Guidelines only being issued on April 23, 1970, 35 Fed.Reg. 7390. The FPC's guidelines were issued on December 4, 1970. 35 Fed.Reg. 18958.[23] Thus, in January and February of 1970, it was questionable whether the granting of a certificate or other entitlement for use was even an "action" within the meaning of Section 102(c), much less a "major federal action." It was not until the publication of the CEQ Interim Guidelines on April 30, 1970-a month after the certificate was issued-that the former question was resolved.[24] Whether a project is a "major federal action" is, of course, a question which can only be resolved through a careful case-by-case analysis. Taking into consideration the facts that the Transco LNG facility had been in operation for a considerable period, that this was an expansion of an existing facility, that there was no expenditure of any federal funds, and that there was no taking of any public lands, it is quite reasonable for the FPC to have concluded-in the absence of any indication to the contrary-that this was not the sort of federal "action" that required a Section 102 impact statement. It is important to note that the approval of the construction of the facility in question is certainly not the type of "action" which most reasonable men would conclude, without any guidelines, to be either "major" or even an "action." Cf. Calvert Cliffs', supra. We therefore conclude that the failure of the FPC to prepare an impact statement does not invalidate the issuance of the certificate.
 
 
 25
 The order of the District Court will be affirmed.
 
 
 
 [1]
 15 U.S.C. Sec. 717a(6) defines a "natural gas company" as an entity engaged in "the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."
 
 
 [2]
 See 15 U.S.C. Sec. 717f
 
 
 [3]
 See Transcontinental Gas Pipe Line Corp. v. Department of Conservation, 43 N.J. 135, 202 A.2d 849 (1964). Transco's pipelines have run through the meadowlands since 1950
 
 
 [4]
 N.J.S.A. 13:17-1 et seq
 
 
 [5]
 N.J.S.A. 13:17-9
 See also N.J.S.A. 13:17-11:
 "The master plan shall include provisions or criteria for the location and use of buildings, structures, facilities, and land for solid waste disposal, and may include provisions for: (1) the use of land and buildings, residential, commercial, industrial, mining, agricultural, park and other like purposes; (2) service-water supply, utilities, sewerage, and other like matters; (3) transportation, streets, parking, public transit lines, and stations both above and below ground level, freight facilities, airports, harbors, channels, docks and wharves, and other like matters; (4) housing, residential standards; clearance, redevelopment, rehabilitation, conservation, and other like matters; (5) water, forest, soil conservation, flood control, and other like matters; (6) public and semipublic facilities including but not limited to civic centers, schools, libraries, parks, playgrounds, fire houses, police buildings, hospitals, and other like matters; (7) the distribution and density of population; (8) planned unit development; (9) community appearance; (10) financing and programming capital improvements; (11) and other related elements of growth and development, including the social implications of any proposed development, and advances in technology related to any subject included in the plan."
 
 
 [6]
 N.J.S.A. 13:17-1. Of these 21,000 acres 18,000 are within the Commission's jurisdiction and apparently 10,000 acres have been deemed by the Commission to be "sufficiently undeveloped" for zoning and planning purposes
 
 
 [7]
 N.J.S.A. 13:17-12
 
 
 [8]
 The FPC certificate was issued to Transco prior to the adoption by the Commission of those portions of the Master Plan which prohibit the construction of the proposed facility
 
 
 [9]
 The Commission's resolution reads in relevant part as follows:
 "The consensus of the special committee studying the Transcontinental proposal for the construction of a second above-ground facility, concurred in by a majority of the members at a formal meeting held on Wednesday, June 10, was that the Commission would instruct its staff to approve the variance and building permit of Transcontinental, after the public hearing on the variance, provided the company enter into a written agreement containing the following:
 ". . .
 "II. A covenant, acceptable in form to both the Company and the Commission, which will require and guarantee the removal of existing above ground gas storage facility and the proposed one, and all ancillary equipment and structures thereto within 10 years of the date of execution. The forms and provisions of the covenant to be agreed upon by both parties prior to the approval of the variance and the covenant to be filed at the same time as the building is approved.
 "III. The execution of a performance bond for the removal of both above ground facilities and all ancillary equipment and structures thereto at the lapse of 10 years."
 
 
 [10]
 15 U.S.C. Sec. 717f(b) states: "No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment."
 
 
 [11]
 An injunction was also entered directing the Borough of Carlstadt, defendants in the District Court, to issue the necessary building permits
 
 
 [12]
 The FPC was granted leave to appear as amicus curiae in the proceedings below. Its motion to present brief and oral argument to this Court was also granted and we are appreciative of counsel's presentation
 
 
 [13]
 In Southern Pacific, supra, the Supreme Court stated:
 "The principle that, without controlling Congressional action, a state may not regulate interstate commerce so as substantially to affect its flow or deprive it of needed uniformity in its regulation is not to be avoided by 'simply invoking the convenient apologetics of the police power."' 325 U.S. at 779, 65 S.Ct. at 1525, citing Kansas City Southern R. Co. v. Kaw Valley District, 233 U.S. 75, 79, 34 S.Ct. 564, 58 L.Ed. 857 (1914) (emphasis added).
 
 
 [14]
 It is important to emphasize that the Commission is not attempting to require the Transco facility to conform to any specific regulation. Rather it is attempting to prohibit construction altogether
 
 
 [15]
 The New Jersey Sports and Exposition Law declares in Section 2 "that the general welfare, health and prosperity of the people of the State will be promoted by the holding of athletic contests, horse racing and other spectator sporting events and of trade shows and other expositions in the State; that in order to induce professional athletic teams, particularly major league football and baseball teams, to locate their franchises in the State, it is necessary to provide stadiums and related facilities for the use of such teams, in addition to the facilities for horse racing and other spectator sporting events; that such stadiums and other facilities would also accommodate other events and serve other uses which would provide needed recreation, forums and expositions for the public." N.J.S.A. 5:10-2
 
 
 [16]
 The site was presumably chosen with the Commission's approval as the Sports Authority Law requires
 
 
 [17]
 The District Court determined that the burden which the Commission placed upon Transco to convince the Commission that the property was safe without having set forth reasonable and specific standards "was quite unreasonable in view of the potential conflict with a federally regulated business." We agree
 
 
 [18]
 "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Company, 333 U.S. 364, 394-395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)
 
 
 [19]
 Appellant also attacks a reference in the District Court's opinion to what allegedly occurred at the administrative proceedings before the Commission. The Court's remarks were, however, at most parenthetical and this issue is of no import at this point
 
 
 [20]
 Since we have concluded that the District Court's findings on the safety issue are supported by the record and since the Commission had no applicable criteria of its own, we need not discuss the issue of federal preemption. See generally the Natural Gas Pipeline Safety Act of 1968, 49 U.S.C. Sec. 1671 et seq., Florida Lime & Avocado Growers Inc. v. Paul, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Northern States Power Company v. State of Minnesota, 404 U.S. 1056, 92 S.Ct. 741, 30 L.Ed.2d 744 (1972); 1968 U.S.Code Cong. & Admin. News, p. 3241
 
 
 [21]
 For a comprehensive discussion of the background and scope of NEPA, see Calvert Cliffs', supra
 
 
 [22]
 Section 102 reads as follows:
 "The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall-
 (A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision-making which may have an impact on man's environment;
 (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations;
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented.
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of Title 5, shall accompany the proposal through the existing agency review processes;
 (D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;
 (E) recognize the worldwide and longrange character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;
 (F) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;
 (G) initiate and utilize ecological information in the planning and development of resource-oriented projects, and
 (H) assist the Council on Environmental Quality established by subchapter II of this chapter."
 
 
 [23]
 The FPC regulations have been amended several times and are now contained in 36 Fed.Reg. 22738 (Nov. 9, 1971). The regulations provide in essence that an application for a certificate pursuant to Section 7(c) of the Act must submit with the application "a detailed statement of the [five] environmental factors." This procedure is followed in lieu of an independent FPC inquiry and impact statement and has been held inadequate by the 2nd Circuit. Greene County Planning Board v. F. P. C., 455 F.2d 412 (2nd Cir. 1972). There the Court held that the statement must be prepared by the F.P.C.'s staff and not the appellant
 
 
 [24]
 35 Fed.Reg. 7390 (April 30, 1970) read in relevant part:
 "Actions included. The following criteria will be employed by agencies in deciding whether a proposed action requires the preparation of an environmental statement:
 (a) 'Actions' include but are not limited to:
 (i) Recommendations or reports relating to legislation and appropriations;
 (ii) Projects and continuing activities:
 -Directly undertaken by Federal agencies;
 -Supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance;
 -Involving a Federal lease, permit, license, certificate or other entitlement for use;
 (iii) Policy-and procedure-making."