**NORFOLK SOUTHERN CORPORATION, Norfolk Southern Marine Services, Inc., Lamberts Point Barge Co., Inc., Coastal Barge Corporation, Coal Logistics Corporation, and Coastal Carriers Corporation, Plaintiffs,**

v.

**Charles M. OBERLY, III, Attorney General of the State of Delaware, and John E. Wilson, III, Secretary, Department of Natural Resources and Environmental Control of the State of Delaware, Defendants,**

**Delaware Saltwater Sportfishing Association, Inc., Kent County Levy Court, Natural Resources Defense Council, Inc., National Audubon Society, and the Sierra Club, Intervening Defendants.**

**Civ. A. No. 84–330 MMS.**

United States District Court,
D. Delaware.

April 8, 1986.

David S. Swayze, of Duane, Morris &
Hecksher, Wilmington, Del., for plaintiffs

Norfolk Southern Corp., Norfolk Southern Marine Services, Inc. and Lamberts Point Barge Co., Inc.; Jeffrey S. Berlin, and David E. Menotti, of Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Washington, D.C., of counsel.

Robert J. Katzenstein, and Clark W. Furlow, of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del., for plaintiffs Coastal Barge Corp., Coal Logistics Corp., and Coastal Carriers Corp.

Fred S. Silverman, State Solicitor, and Regina M. Mullen, John J. Polk, and Ellen R. Chaikin, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendants.

Nicholas H. Rodriguez, of Schmittinger and Rodriguez, Dover, Del., for intervening defendants; Lynne Edgerton, Sarah Chasis, and Ralph Hallo, of Natural Resources Defense Council, Inc., Joel B. Harris, Mindy J. Spector, Scott T. Maker, and Robert D. Helfand, of Weil, Gotshal & Manges, New York City, of counsel.

Anthony G. Flynn, Counsel to the Governor, Dover, Del., for amici curiae Michael N. Castle, Governor of Delaware, William V. Roth, Jr., Joseph R. Biden Jr., U.S. Senators, and Thomas R. Carper, Member of Congress; Morris, Nichols, Arsht & Tunnell, Georgetown, Del., of counsel.

Philip D. Saxon, of Duane, Morris & Hecksher, Wilmington, Del., for amici curiae Frederick C. Boucher, Member of Congress, John W. Warner, Paul S. Trible, Jr., U.S. Senators, Herbert H. Bateman, Alan B. Mollohan, Jim Olin, Nick Joe Rahall, II, Norman Sisisky, Harley O. Staggers, Jr., and G. William Whitehurst, Members of Congress.

Edward W. Cooch, Jr., of Cooch & Taylor, and Gregory A. Inskip, of Potter Anderson & Corroon, Wilmington, Del., for amici curiae Delaware Wild Lands, Inc. and Delaware Nature Educ. Society, Inc.

David G. Burwell, Washington, D.C., for amici curiae Nat. Wildlife Federation and Delaware Wildlife Federation.

William C. Carpenter, Jr., U.S. Atty., Dept. of Justice, Wilmington, Del., F. Henry Habicht, II, Asst. Atty. Gen., Jose R. Allen, David F. Shuey, and Margaret A. Hill, Dept. of Justice, Washington, D.C., for amicus curiae the U.S.

John K. Van de Kamp, Atty. Gen. of the State of Cal., Andrea Sheridan Ordin, Chief Asst. Atty. Gen., N. Gregory Taylor, Asst. Atty. Gen., and Linus Masouredis, Deputy Atty. Gen., San Francisco, Cal., for amicus curiae the California Coastal Com'n.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiffs seek declaratory and injunctive relief preventing the defendant state officials from administering and enforcing against them the Delaware Coastal Zone Act ("the Delaware CZA"), 7 Del.C.Ann. § 7001 et seq., which prohibits plaintiffs' proposed activities in the Delaware coastal zone. Pending are cross-motions for summary judgment.[1]

### I. Factual Overview

Plaintiffs[2] seek to improve the competitiveness of their coal-exporting operations by establishing a coal "top-off" service at Big Stone Anchorage, which lies off the coast of Delaware in Delaware Bay.

---

1. Plaintiffs previously sought a preliminary injunction enjoining enforcement of the Delaware CZA against them and requiring that the State process their pending applications for air pollution control permits under the Delaware Environmental Protection Law, 7 Del.C.Ann. § 6001 et seq. (1974 & 1984 Supp.). Judge Longobardi denied the motion on the grounds that plaintiffs had made no showing of irreparable injury, and also out of deference to the action then pending before the Delaware Supreme Court on the merits of the Superior Court decision that plaintiffs' proposed activities fell within the strictures of the Delaware CZA. *Norfolk Southern Corp. v. Oberly,* 594 F.Supp. 514, 521–22, 523 (D.Del. 1984).

2. Plaintiffs are Norfolk Southern Corp., Norfolk Southern Marine Services, Inc., Lamberts Point Barge Co., Inc., Coastal Barge Corp., Coal Logistics Corp., and Coastal Carriers Corp.

 For convenience, reference will be to "plaintiffs" generally, although not all have been involved throughout the entire history of the project and litigation.

At present, plaintiffs ship coal from the East Coast on colliers or partially loaded supercolliers, because East Coast port facilities are too shallow to accommodate fully loaded supercolliers. Fully loaded supercolliers, which have a carrying capacity ranging from 100,000 to more than 160,000 deadweight tons, represent a more cost-effective means of transporting coal.

Plaintiffs propose to load supercolliers partially at East Coast ports and thereafter the supercolliers would move to Big Stone Anchorage, where coal barges would "top-off" the partially loaded supercolliers before their departure to foreign countries. This top-off operation will reduce shipping costs, thereby assertedly making plaintiffs' coal more competitive in the world market.

Plaintiffs seek to use Big Stone Anchorage [3] because it is the only naturally protected anchorage between Maine and Mexico with a depth of 55 feet or more.[4] Because of its relative protection from the elements, Big Stone Anchorage is and has been used for oil-lightering operations that transfer imported oil from supertankers to smaller vessels capable of navigating in shallower East Coast waters.[5]

Plaintiffs began exploring the idea of a coal top-off operation in 1981,[6] and first contacted Delaware state officials about the matter in late 1982. In February, 1984, after several favorable discussions with state officials, plaintiffs were advised to submit to the Delaware Department of Natural Resources and Environmental Control (DNREC) an application for a status decision under the Delaware CZA.

The purpose of the Coastal Zone Act, 7 Del.C.Ann. § 7001 et seq. (1974 & 1984 Supp.), is to "control the location, extent and type of industrial development in Delaware's coastal areas"[7] in order to "better protect the natural environment of its bay and coastal areas and safeguard their use primarily for recreation and tourism." Id. § 7001. New heavy industry in the coastal area is entirely prohibited as incompatible with protection of the natural environment. Id. § 7003. New manufacturing uses and expansion of existing manufacturing uses in the coastal zone are allowed by permit only. Id. § 7004. Of central concern to this litigation is the statute's total ban on new offshore gas, liquid, or solid bulk product transfer facilities, id. § 7003,[8] a ban the

---

**3.** In May, 1983, the Coast Guard, pursuant to its authority under 33 U.S.C. § 471, redesignated Big Stone Anchorage as a "general anchorage," 48 Fed.Reg. 23,636 (1983), a change designed to permit "shippers transporting commodities other than oil to use [Big Stone Anchorage] as both a holding anchorage and an anchorage for lightering." 33 C.F.R. 110.157. Previously, Big Stone Anchorage had been designated specifically to allow supertankers to anchor and conduct their oil-lightering operations.

**4.** Plaintiffs assertedly cannot use a location farther out from shore because of the frequency and severity of storms on the Atlantic Ocean.

**5.** Oil lightering is not subject to the Delaware CZA ban on offshore bulk product transfer facilities because it was grandfathered in as an existing use. See 7 Del.Code Ann. § 7003 ("bulk product transfer facilities which are not in operation on June 28, 1971, are prohibited in the coastal zone....").

**6.** The preliminary negotiations are discussed in greater detail in Norfolk Southern Corp. v. Oberly, 594 F.Supp. 514, 517–18 (D.Del.1984).

**7.** The "coastal zone" subject to the Delaware CZA is defined at 7 Del.C.Ann. § 7002(a). The

coastal zone extends the length of the state and averages four miles in width. Office of Coastal Zone Management, NOAA, U.S. Dept. of Commerce, Delaware Coastal Management Program and Final Environmental Impact Statement, Summary at 3 (1980), Second Aff. of David S. Hugg, III, Ex. C. (Dkt. 123A). Both land and water areas are included within the coastal zone.

**8.** Section 7003 reads:

Heavy industry uses of any kind not in operation on June 28, 1971, are prohibited in the coastal zone and no permits may be issued therefor. In addition, offshore gas, liquid, or solid bulk product transfer facilities which are not in operation on June 28, 1971, are prohibited in the coastal zone, and no permit may be issued therefor. Provided, that this section shall not apply to public sewage treatment or recycling plants. A basic steel manufacturing plant in operation on June 28, 1971, may continue as a heavy industry use in the coastal zone notwithstanding any temporary discontinuance of operations after said date, provided that said discontinuance does not exceed 1 year.

legislature found "imperative" on the grounds that these facilities "represent a significant danger of pollution to the coastal zone and generate pressure for the construction of industrial plants in the coastal zone." *Id.* § 7001.

On February 23, 1984, the Secretary of DNREC issued a status decision concluding that the Delaware CZA did not prohibit plaintiffs' proposal, because a coal top-off service was not a "bulk product transfer facility" as defined by § 7002(f).[9] This decision was appealed to the State Coastal Zone Industrial Control Board ("the Board"),[10] which reversed the Secretary. The Board held the coal top-off project was a bulk product transfer facility within the meaning of the statute and therefore coal topping-off was a prohibited activity. The Superior Court upheld the Board's decision, and the Delaware Supreme Court affirmed. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242 (Del.1985). Plaintiffs, relying upon the Commerce Clause, challenge the application of the Delaware CZA's prohibition of bulk product transfer facilities to their proposed top-off operation.

## II. Legal Overview

 The Commerce Clause is both an affirmative grant of power to Congress and a limitation on the power of the states. By its terms, the Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. In the absence of congressional exercise of that power, the Commerce Clause by its own force prevents the States from erecting barriers to the free flow of interstate commerce. *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793,

54 L.Ed.2d 664 (1978); *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851).[11] At the same time, however, "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976).

In accord with the doctrine that Congress' power over commerce is plenary, *see, e.g., Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196–97, 6 L.Ed. 23 (1824), the Supreme Court has held that "Congress has undoubted power to redefine the distribution of power over interstate commerce. It may either permit the states to regulate the commerce in a manner which would otherwise not be permissible, or ... exclude state regulation even in matters of peculiarly local concern which nevertheless affect interstate commerce." *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 1520, 89 L.Ed. 1915 (1945) (citations omitted).

Absent congressional guidance, the courts are called upon to make the "delicate adjustment of the conflicting state and federal claims" when a state regulation is challenged under the Commerce Clause. *Raymond Motor*, 434 U.S. at 440, 98 S.Ct. at 793 (quoting *H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 553, 69 S.Ct. 657, 679, 93 L.Ed. 865 (1949) (Black, J., dissenting)); *see also Southern Pacific*, 325 U.S. at 766–71, 65 S.Ct. at 1518–21. Three general approaches have been used to determine whether a state statute violates the Commerce Clause: a deferential balancing approach for "evenhanded" regulation; stricter scrutiny for "discriminatory" regulation; and a more highly defer-

---

**9.** Section 7002(f) reads:

> "Bulk product transfer facility" means any port or dock facility, whether an artificial island or attached to shore by any means, for the transfer of bulk quantities of any substance from vessel to onshore facility or vice versa. Not included in this definition is a docking facility or pier for a single industrial or manufacturing facility for which a permit

is granted or which is a nonconforming use. Likewise, docking facilities for the Port of Wilmington are not included in this definition.

**10.** Pursuant to 7 Del.C.Ann. § 7007(a) (1984).

**11.** This implied limitation is commonly referred to as the "dormant Commerce Clause."

ential standard for certain safety regulations.[12]

In brief, plaintiffs urge the Delaware ban on the proposed coal-transfer operation is subject to strict scrutiny because it discriminates against out-of-state interests in favor of in-state interests and burdens foreign commerce. They contend that the prohibition fails to withstand that scrutiny and thus violates the Commerce Clause. Alternatively, plaintiffs argue that even under the more deferential balancing approach for evenhanded regulation, the ban impermissibly burdens commerce.

Defendants deny the Delaware prohibition is subject to strict scrutiny. They contend the prohibition is entitled to the most highly deferential standard of review, and that it satisfies that standard. Alternatively, defendants claim it can be upheld as well under the standard balancing test for evenhanded regulation. In addition, defendants argue that Congress has given its consent to the Delaware legislation by its passage of the Coastal Zone Management Act of 1972 ("the CZMA" or "the Act") and by the subsequent approval of the Delaware coastal management plan, which includes the CZA, by the Secretary of Commerce. Thus, defendants urge the Delaware prohibition is immune from Commerce Clause attack.

I hold the cross-motions for summary judgment must be denied absent congressional consent. However, because I conclude Congress authorized the Delaware CZA, including its ban of the coal top-off operation, summary judgment will be entered for defendants.

## III. Legal Standards

### A. Summary Judgment Standard

The Federal Rules of Civil Procedure provide summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When a motion is made and supported, "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 56(e); *see also Fireman's Insurance Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982) (cannot "rely merely upon bare assertions, conclusory allegations or suspicions") (citing cases).

Summary judgment often has been characterized in this circuit as a "drastic remedy." *See Sunshine Books, Ltd. v. Temple University*, 697 F.2d 90, 95 (3d Cir.1982) (citing cases). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and materials it submits must be viewed in the light most favorable to the opposing party. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). If the moving party fails to establish the absence of a genuine issue, summary judgment must be denied even if the opposing party presents no evidence. *Id.* 398 U.S. at 160, 90 S.Ct. at 1609. The moving party cannot obtain summary judgment if there is any evidence in the record from which a reasonable inference with respect to the

---

**12.** The tests are oversimplified above, but are set forth in more detail at *infra* pp. 1232–33.

The legal standards governing the review of state regulation under the Commerce Clause remain unsettled. *See Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 706, 101 S.Ct. 1309, 1334, 67 L.Ed.2d 580 (1981) (Rehnquist, J., dissenting); *American Trucking Associations, Inc. v. Larson*, 683 F.2d 787, 790 (3d Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 448, 74 L.Ed.2d 603 (1982); *Aldens, Inc. v. Packel*, 524 F.2d 38, 45 (3d Cir.1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). *See also*

*Raymond Motor*, 434 U.S. at 440, 98 S.Ct. at 793 ("experience teaches that no single conceptual approach identifies all of the factors that may bear on a particular case.").

Academic criticism of current Commerce Clause jurisprudence includes: Eule, *Laying the Dormant Commerce Clause to Rest*, 91 Yale L.J. 425 (1982); Maltz, *How Much Regulation is Too Much—An Examination of Commerce Clause Jurisprudence*, 50 Geo.Wash.L.Rev. 47 (1981); Tushnet, *Rethinking the Dormant Commerce Clause*, 1979 Wisc.L.Rev. 125 (1979).

ultimate facts may be drawn in favor of the responding party. *In Re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238, 258 (3d Cir.1983), *rev'd,* —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Finally, "where constitutional issues of large public import are involved, the Court's scrutiny of the record, to ensure that there are no disputed issues of material fact, must be particularly exacting." *Pettinaro Construction Co. v. Delaware Authority for Regional Transit,* 500 F.Supp. 559, 563 (D.Del.1980).

### B. The Commerce Clause Standards

Whether there exists a "genuine issue as to any material fact" depends upon what facts are "material." The materiality of a fact, in turn, depends upon the applicable legal standard. The Court's chore is to choose the correct substantive legal standard.

The test that forms the touchstone in Commerce Clause analysis was distilled by the Supreme Court in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> [W]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 443 [80 S.Ct. 813, 815, 4 L.Ed.2d

852]. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.[13]

■ The flexible *Pike* balancing test does not apply, however, to state regulation that effectuates economic protectionism. *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984); *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978). In such cases, stricter scrutiny or a "virtual *per se*" rule of unconstitutionality is applied. *South-Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 2247, 81 L.Ed.2d 71 (1984); *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535.

A finding that state legislation constitutes "economic protectionism" can be made on the basis of either discriminatory purpose or discriminatory effect. *Bacchus Imports,* 104 S.Ct. at 3055; *Minnesota v. Clover Leaf,* 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981). A statute that "overtly blocks the flow of interstate commerce at a State's borders" falls most easily into this strictly scrutinized category. *City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535.

■ The burden of showing discrimination rests on the party challenging the va-

13. The *Pike* Court continued: "Occasionally the Court has candidly undertaken a balancing approach in resolving these issues ... but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens." *Id.* The balancing approach now prevails for evenhanded regulation. *See Arkansas Elec. Coop. Corp. v. Arkansas Public Comm'n,* 461 U.S. 375, 389–94, 103 S.Ct. 1905, 1915–18, 76 L.Ed.2d 1 (1983); *Baltimore Gas & Elec. Co. v. Heintz,* 760 F.2d 1408, 1420–22 (4th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985). *See also DiSanto v. Pennsylvania,* 273 U.S. 34, 44, 47 S.Ct. 267, 271, 71 L.Ed. 524 (1927) (Stone, J., dissenting) (direct/indirect analysis is "too mechanical, too uncertain in its application, and too remote from actualities, to be of value."

Using that test is "doing little more than using labels to describe a result rather than any trustworthy formula by which it is reached."). The *Baltimore Gas* court suggested that the virtual *per se* prohibition on "direct" burdens on interstate commerce is preserved, "albeit in a different formulation," in the *Pike* test's requirement of evenhandedness. 760 F.2d at 1422.

One commentator has noted that "[a]t most, the fluid criteria of *Pike* provide a framework for Commerce Clause analysis; they provide no litmus test of constitutionality." Hellerstein, *Hughes v. Oklahoma: The Court, the Commerce Clause, and State Control of Natural Resources,* 1979 Sup.Ct.Rev. 51, 67. *See also* articles cited in *supra* note 12.

lidity of the statute. *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). Once discrimination is demonstrated, however, "the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of non-discriminatory alternatives adequate to preserve the local interests at stake." *Id.* (quoting *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977)). "At a minimum ... facial discrimination involves the strictest scrutiny of any purported legitimate local purpose and the absence of nondiscriminatory alternatives." *Hughes,* 441 U.S. at 337, 99 S.Ct. at 1737. Stated differently, the State must demonstrate a "close fit" between the burden on interstate commerce and the asserted local purpose. *Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 957, 102 S.Ct. 3456, 3464, 73 L.Ed.2d 1254 (1982).[14]

■ Restrictions burdening foreign commerce may also be subject to heightened scrutiny. *See South-Central Timber,* 104 S.Ct. at 2247. *But see* text at *infra* pp. 1238–39.

Cases involving state highway safety regulation form a third general category. *See, e.g., Kassel,* 450 U.S. at 670, 101 S.Ct. at 1316. This type of regulation enjoys a presumption of validity stronger than that provided in the *Pike* test. *See id.* The extent of this presumption, however, is not clear. In the most recent Supreme Court case in the highway safety category, three separate approaches were used, none of which won the votes of a majority of the justices. *See id.; see also American Trucking,* 683 F.2d at 790–95 (choosing

approach of Justice Rehnquist in *Kassel* dissent) and at 802–04 (Adams, J., dissenting) (choosing approach of *Kassel* plurality).

The plurality in *Kassel,* in effect, adopted a stronger presumption of validity within the standard *Pike* balancing test. *See* 450 U.S. at 670–71, 101 S.Ct. at 1316–17 (Powell, J.); *see also Raymond Motor,* 434 U.S. at 442–44, 98 S.Ct. at 794–96. The two other approaches reject a balancing inquiry. Justice Brennan would defer to the state legislature if the intended benefit "is not illusory, insubstantial, or nonexistent." *Kassel,* 450 U.S. at 681 n. 1, 101 S.Ct. at 1313 n. 1 (Brennan, J., concurring). Actual benefits and burdens are not to be examined: "the only relevant evidence is whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes." *Id.* at 680, 101 S.Ct. at 1321. Justice Rehnquist's approach, most deferential to the states, inquires only whether the asserted state justification is merely a pretext for discrimination against interstate commerce. *Id.* at 692, 101 S.Ct. at 1327 (Rehnquist, J., dissenting). A pretext may be assumed, however, when the benefits are "demonstrably trivial while the burden on commerce is great." *Id.*

## IV. Commerce Clause Analysis Absent Congressional Consent

■ The *Pike* balancing test properly applies to plaintiffs' Commerce Clause challenge. However, that test cannot be applied on summary judgment in this case. Because this conclusion is predicated upon the rejection of arguments advanced by both parties, the Court will discuss each of those arguments.[15]

---

14. The rationale for applying stricter scrutiny to state regulations that disproportionately burden out-of-state interests relates to the relative adequacy of the political process. Because the burdens associated with facially neutral regulations will typically fall on local as well as out-of-state interests, the state's political processes will tend to check unduly burdensome regulations. That check dissipates when the burden falls more heavily on out-of-state interests. *See Kassel,* 450 U.S. at 675–76, 101 S.Ct. at 1318–19; *South-Central Timber,* 104 S.Ct. at 2243.

15. It is important to frame properly the scope of the Commerce Clause inquiry. While the case law is far from clear, the Court will look to the benefits and burdens of the Delaware CZA's prohibition of "offshore gas, liquid, or solid bulk product transfer facilities which are not in operation on June 28, 1971." 7 Del.C.Ann. § 7003 (1984 Supp.).

The Court will not examine the Delaware CZA as a whole, nor focus narrowly on its prohibition of plaintiffs' proposed coal lightering activity. The broad approach could allow otherwise

## A. Plaintiffs' Arguments for Strict Scrutiny

Plaintiffs contend a virtual *per se* rule of invalidity or strict scrutiny applies to the Delaware CZA because the statute interferes with foreign commerce and effects economic protectionism.

### 1. Economic Protectionism

■ The threshold inquiry posed by plaintiffs' Commerce Clause challenge is "whether the primary purpose or effect of the [Delaware CZA] ... is to favor in-state economic interests or to burden out-of-state economic interests." *Harvey & Harvey, Inc. v. Delaware Solid Waste Authority*, 600 F.Supp. 1369, 1379 (D.Del.1985). Even if the regulation deals with matters traditionally of local concern, strict scrutiny is applied if the measure is protectionist in nature. *See id.; City of Philadelphia*, 437 U.S. 617, 98 S.Ct. 2531. "The critical inquiry ... must be directed to determining whether [the statute] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535.[16]

Plaintiffs contend strict scrutiny is mandated by the alleged disproportionality of the Delaware CZA. Specifically, they allege "[t]he CZA's invalid protectionism consists of its tipping the competitive balance in favor of activities that benefit local interests and against activities that benefit only out-of-state users." Dkt. 120 at 51. Stated differently, plaintiffs urge economic protectionism motivated the enactment of the Delaware CZA and its uneven respective burdens upon the litigants causes the Delaware CZA to have a discriminatory effect giving rise to application of a strict scrutiny standard.

unconstitutionally discriminatory or burdensome regulations to be saved by artful enactment as part of a more comprehensive statute that, *in toto*, withstands Commerce Clause attack. A ban on heavy industry that falls exclusively on in-state interests, for example, cannot be used to "balance out" any actual discrimination in the ban on transfer facilities. (The statute as a whole, however, can shed light on the legislative purpose behind the challenged provision.)

The narrow approach, repeatedly advanced by plaintiffs, is equally unsatisfactory because virtually any regulation could be found "discriminatory" or "unduly burdensome" if the claim is drawn narrowly enough. The Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127–28, 98 S.Ct. 2207, 2214–15, 57 L.Ed.2d 91 (1978). The courts should not allow individual plaintiffs to use the Commerce Clause to force the States repeatedly to justify the particular applications of facially evenhanded regulations, nor to "nibble away" at otherwise valid state regulation. Thus, in the context of *Clover Leaf*, 449 U.S. 456, 101 S.Ct. 715, for example, a manufacturer of biodegradable plastic milk containers should take his case for an exemption to the legislature, not the courts. *But see Hunt*, 432 U.S. 333, 97 S.Ct. 2434 (affirming invalidation of facially evenhanded regulation "insofar as it prohibited the display of Washington State apple grades").

16. There is no dispute that, on its face, the Delaware CZA regulates evenhandedly. Cases addressing facially discriminatory regulations, which are easily deemed discriminatory in purpose and/or effect, do not control. *See, e.g., Bacchus Imports*, 468 U.S. 263, 104 S.Ct. 3049 (tax exemption for locally-produced alcoholic beverages); *South-Central Timber*, 467 U.S. 82, 104 S.Ct. 2237 (requiring in-state processing of timber); *Sporhase*, 458 U.S. 941, 102 S.Ct. 3456 (reciprocity requirement for export of ground water); *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (prohibiting investment services by out-of-state bank holding companies); *Hughes*, 441 U.S. 322, 99 S.Ct. 1727 (banning export of minnows); *City of Philadelphia*, 437 U.S. 617, 98 S.Ct. 2531 (prohibiting import of waste); *Cottrell*, 424 U.S. 366, 96 S.Ct. 923 (reciprocity requirement for import of milk); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) (requiring preference for in-state purchasers of natural gas).

Unlike the regulations dealt with in these and other cases, the Delaware CZA does not dispense its benefits and burdens at the State border. All product transfer facilities, not just those owned or operated by out-of-state interests, are subject to the statutory ban. Nor does the Delaware CZA "block the flow" of interstate and foreign commerce at Delaware's borders, as alleged by plaintiffs, in the same way as the statutes struck down in *Hughes* and other cases.

### a. Discriminatory Effect

Assuming *arguendo* the validity of plaintiffs' factual allegations of discriminatory effect, I am not willing to employ a strict scrutiny standard by reason of discriminatory effect in the context of determining the constitutionality of the Delaware CZA.[17]

The Delaware CZA differs significantly from the facially evenhanded statutes subjected to strict scrutiny by the Supreme Court for their discriminatory effect. In those cases, the statute protected an in-state market from out-of-state competition in that same market. *See Hunt*, 432 U.S. 333, 97 S.Ct. 2434 (apples); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (milk); *see also City of Philadelphia*, 437 U.S. 617, 98 S.Ct. 2531 (facially discriminatory regulation of landfill-space market). No similar competitive advantage is being provided by the Delaware CZA. Economic protectionism, the most serious concern in Commerce Clause analysis, *Arkansas Electric*, 461 U.S. at 394, 103 S.Ct. at 1917, is not implicated in the same sense. At issue in this case is a statutory distinction regarding uses, not users.

The Supreme Court decision in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), is instructive. In *Exxon*, the Court considered a Commerce Clause challenge to a Maryland statute that, *inter alia*, prohibited producers or refiners of petroleum products from operating retail service stations within the State. The statute was enacted in response to a finding that stations operated by producers or refiners had received preferential treatment during the 1973 gasoline shortage. No petroleum products were produced or refined in Maryland. Given this market structure, the Court first held that the Maryland statute plainly did not discriminate against interstate goods nor favor local producers and refiners. *Id.* 437 U.S. at 125, 98 S.Ct. at 2213. With regard to the claim that the effect of the statute was to protect in-state dealers from out-of-state competition, the Court held the fact that the divestiture requirement fell solely on interstate companies (though not all interstate companies) which operated gasoline stations in Maryland did not lead, "either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level." *Id.;*[18] *cf. Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 42, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (regulation not evenhanded, distinguishing *Exxon*). *But see Exxon*, 437 U.S. at 134–52, 98 S.Ct. at 2218–27 (Blackmun, J., dissenting).

Similarly, in *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981), the Court upheld under the *Pike* test a ban on the retail sale of milk in nonreturnable plastic containers "[e]ven granting that the out-of-state plastics industry is burdened relatively more heavily than the Minnesota pulpwood industry...." Citing *Exxon*, the Court reaffirmed the Commerce Clause

---

**17.** The Court assumes for purposes of this subsection only that economic protectionism cannot be established on the basis of "discriminatory purpose," i.e., that the actual basis for enactment of the Delaware CZA was to protect the environment and control development—not to promote the economic interests of Delaware industries (e.g., tourism, recreation) at the expense of out-of-state industries (e.g., shipping). In fact, a genuine material issue of fact exists as to whether economic protectionism motivated enactment of the Delaware CZA. *See infra* pp. 1237–1238.

**18.** The Court noted that the record demonstrated the existence of major interstate gasoline marketers unaffected by the statute because they did not refine or produce gasoline. *Exxon*,

437 U.S. at 125–26, 98 S.Ct. at 2213–14. This finding is not essential to the Court's holding. The existence of coal exports unaffected by the Delaware CZA, however, likewise supports this Court's holding that the statute does not discriminate against interstate commerce.

The *Exxon* Court noted: "If the effect of a state regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market—as in *Hunt*, 432 U.S., at 347, 97 S.Ct., at 2443, and *Dean Milk*, 340 U.S., at 354, 71 S.Ct., at 297—the regulation may have a discriminatory effect on interstate commerce." 437 U.S. at 126 n. 16, 98 S.Ct. at 2214 n. 16.

protects the interstate market, not particular interstate firms, and made it clear that a regulation is not discriminatory simply because it causes some business to shift from out-of-state to in-state firms. *Id.* 449 U.S. at 474, 101 S.Ct. at 729. *See also City of Philadelphia,* 437 U.S. at 624, 98 S.Ct. at 2535 (*Pike* test applies where "other legislative objectives are credibly advanced and there is no patent discrimination against interstate trade"), 627, 98 S.Ct. at 2537 (permissible to slow flow "of *all* waste into the State's remaining landfills, even though interstate commerce may incidentally be affected"); *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 617–19, 101 S.Ct. 2946, 2953–54, 69 L.Ed.2d 884 (1981) (Montana severance tax on coal, 90% of which is shipped out of state); *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific R.R.,* 393 U.S. 129, 140–42, 89 S.Ct. 323, 328–30, 21 L.Ed.2d 289 (1968) (full-crew requirement for railroads, with mileage-based exemptions that had the effect of exempting all intrastate railroads but few interstate railroads); *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) (city smoke abatement ordinance applied to ships engaged in interstate commerce).[19]

■ In the present case, the fact that the ban on bulk product transfer facilities may fall exclusively on out-of-state interests does not require a conclusion that the State is discriminating for purposes of Commerce Clause analysis. Like the Maryland legislature in *Exxon,* the Delaware legislature may respond to a perceived problem that happens to arise almost exclusively outside the State. The Commerce Clause has never been construed to force a State to stand by helplessly in such situations. In this sense, at least, not all "protectionist" regulation is discriminatory in violation of the Commerce Clause. *See also Kassel,* 450 U.S. at 705–06, 101 S.Ct. at 1334 (Rehnquist, J., dissenting) (safety and protectionist motives often inherently intertwined).[20]

For the foregoing reasons, the Court holds that strict scrutiny is not warranted on the basis of the alleged discriminatory effect alone. For purposes of deciding which test applies, the prohibition "regulates evenhandedly" in effect and its effects on interstate commerce are "only incidental."[21]

> The mere fact that Philadelphia is in another state should not imbue it with greater rights than it would possess if it were located in New Jersey. The Commerce Clause was intended as a shield against discrimination, not as a sword to obtain a preference.
> *Id.* 495 A.2d at 56.

**19.** The Third Circuit Court of Appeals in *American Trucking,* 683 F.2d 787, dealt with a different type of discrimination claim. Plaintiffs challenged a Pennsylvania statute that required periodic inspections, by any state, of motor carrier vehicles operated in Pennsylvania. The court rejected plaintiffs' argument that, because Pennsylvania carriers were already subject to a state inspection program, the statute discriminated against out-of-state carriers. *Id.* at 798 n. 10.

**20.** In *Borough of Glassboro v. Gloucester County Board,* 100 N.J. 134, 495 A.2d 49, *cert. denied,* —— U.S. ——, 106 S.Ct. 532, 88 L.Ed.2d 464 (1985), the City of Philadelphia unsuccessfully attempted to stay an order enjoining use of a New Jersey landfill by all but three New Jersey counties. The Supreme Court of New Jersey, in an unanimous opinion, distinguished *City of Philadelphia,* 437 U.S. 617, 98 S.Ct. 2531, noting that the injunction was unrelated to the trash's place of origin. 495 A.2d at 55. That Philadelphia was the largest customer of the landfill did not change the result. In language fully applicable to plaintiffs' charge that the Delaware CZA is discriminatory, the court held:

**21.** One additional factor counsels against applying strict scrutiny in this case. Even if Congress did not actually authorize the Delaware CZA, *see infra* pp. 1244–53, the enactment of the Coastal Zone Management Act of 1972 and its subsequent amendments in 1976 and 1980 demonstrate that Congress has taken particular interest in the State-Federal relationship with respect to coastal zone areas and is likely to redefine the roles and responsibilities of the States as needed. The CZMA requires the Commerce Secretary to submit to the President and Congress biennial reports on the administration of the CZMA, which reports must include a description of the various state programs and recommendations for additional legislation deemed necessary by the Secretary. 16 U.S.C. § 1462(a), (b). In such circumstances, with the federal interest protected by Congress itself, the

 Even if strict scrutiny were applicable, it should not be applied on summary judgment because material issues of fact exist as to the extent of any disproportionality. Plaintiffs and supporting amici contend that a coal top-off service at Big Stone Anchorage will promote national export policies and directly benefit out-of-state mining, railroad, and labor interests. Delaware interests and residents, on the other hand, will not benefit significantly from the offshore operations. Plaintiffs also point to uses permitted by the Delaware CZA, such as pleasure boating and fishing, and exceptions for the Port of Wilmington, § 7002(f), and sewage treatment and recycling plants, § 7003, in arguing the statute favors Delaware interests. *See* Dkt. 120 at 49–58 (effect and intent).

Other facts, however, support defendants. Two of the six plaintiffs are Delaware corporations. More importantly, the prohibition on bulk product transfer facilities in the coastal zone, which extends over both water and land areas, by definition burdens Delaware interests. No individual or business can construct a bulk product transfer facility on its property if within the coastal zone.

The legislative history of the federal Coastal Zone Management Act indicates that the Delaware CZA was debated for six weeks in the legislature and vigorously fought by, among others, the Delaware Chamber of Commerce, the state Building and Construction Trades Council, and thirteen oil companies. Lindsay, Showdown on Delaware Bay (interview with Gov. Russell W. Peterson originally published in Saturday Review), *reprinted in Legislative History of the Coastal Zone Management Act of 1972, as amended in 1974 and 1976 with a Section-by-Section Index*, 94th Cong., 2d Sess. 256–61 at 257 (1976) (hereinafter cited as *Legislative History* ). Developers and landowners also opposed the bill. *Id.* at 259. One of the oil companies had purchased a 5,800-acre site on the bay on which it planned to build a refinery and petrochemical plant; a consortium of thir-teen oil companies had proposed an oil transfer pipeline into the bay and a storage tank farm on shore; another company proposed a coal-transfer operation involving a 300-acre terminal and the use of self-unloading barges and deep-draft carriers (the project would later be expanded to include iron ore and cover a 500-acre terminal). *Id.* at 257. Jobs and tax revenues were among the reasons invoked in opposition to the Delaware CZA. *Id.* at 258.

Plaintiff Coastal Barge Corp.'s own application to DNREC for a status decision stated that "[t]his project will benefit many Americans, including Delaware residents." Application at # 11, Second Affidavit of David S. Hugg, III (Dkt. 123). Delaware Governor Pierre S. du Pont supported the expansion of the Coast Guard lightening permit to include the transhipment of coal, stating that it "potends positive implications for the Delaware Bay region" and "presents an opportunity that can benefit the general economy of the region." Letter to Capt. David B. Charter, U.S.C.G. Captain of the Port, from Gov. du Pont (Mar. 7, 1983), Dkt. 132A at Ex. U. *See also* Letter to Capt. Daniel B. Charter, U.S.C.G. Captain of the Port, from New Jersey Gov. Thomas H. Kean (Mar. 7, 1983), Dkt. 145A at Ex. JJ. Plaintiffs in fact concede the prohibition of their coal top-off service will impose some burden on Delaware interests. *See e.g.,* Dkt. 120 at 52 n. 18. From the record as discussed, there is at least a genuine issue of material fact as to whether the Delaware CZA discriminates against out-of-state interests. Even if strict scrutiny should be applied to the scenario described by plaintiffs, summary judgment cannot be granted.

**b. Discriminatory Purpose**

While the alleged disproportionate effects do not warrant subjecting the Delaware CZA to strict scrutiny, the inquiry into economic protectionism is not yet ended. The Supreme Court has held that economic protectionism may be found on the basis of *either* discriminatory effect *or* dis-

---

courts should be less eager to force the states to justify particular regulations. *See* Tushnet, *supra* note 12, at 164–65; *see also* Eule, *supra* note 12, at 435–36 (Congress and regulatory agencies will protect national interests worth protecting).

criminatory purpose.[22] *See Bacchus Imports,* 104 S.Ct. at 3055 (and cases cited).

Much of what has been said with respect to discriminatory effect also applies to discriminatory purpose. To the extent the in-state and out-of-state industries differ, discriminatory purpose cannot be established merely by showing that the Delaware CZA happens to burden out-of-state industries disproportionately. Plaintiffs must show the Delaware legislature specifically intended to protect Delaware interests at the expense of out-of-state interests. *See, e.g., Hunt,* 432 U.S. at 352, 97 S.Ct. at 2446 ("glaring" evidence of discriminatory intent); *Kassel,* 450 U.S. at 685, 101 S.Ct. at 1323 (Brennan, J., concurring) (impermissible protectionist purpose of Iowa truck-length regulation).

The starting point in an inquiry as to legislative purpose must be the statute itself. The Delaware CZA includes a statement of purpose that does not distinguish between in-state and out-of-state interests.[23] However, since few statutes will "artlessly disclose[ ] an avowed purpose to discriminate," *Dean Milk,* 340 U.S. at 354, 71 S.Ct. at 298, the courts may look behind a legislature's statement of purpose to determine whether there was a protectionist motive.

Plaintiffs cite statutory exemptions and statements from the statute's legislative history in an attempt to show that economic protectionism motivated the ban on transfer facilities. *See, e.g.,* Dkt. 120 at 50–58. However, substantial evidence to the contrary also exists. *See, e.g., supra* pp. 1237–1238. While on the present record one must harbor doubt that plaintiffs could establish discriminatory intent, a question of fact remains. It follows discriminatory intent cannot be determined on summary judgment.

Strict scrutiny, therefore, may ultimately be applied to the Delaware CZA if at trial the finder of fact concludes the statute was intended to effectuate economic protectionism. Discriminatory effect, while not itself a basis in this case for a finding of economic protectionism, may be cited by plaintiffs as evidence of discriminatory purpose.

### 2. Foreign Burden

Citing two recent Supreme Court cases as authority, plaintiffs argue strict scrutiny is demanded because the Delaware CZA burdens foreign commerce. I disagree.

In *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 99 S.Ct. 1813, 60

**22.** Arguably, showing discriminatory effect is simply an easier means of demonstrating discriminatory intent. While either finding triggers strict scrutiny, most cases combine the two in determining whether the regulation in question discriminates against interstate commerce. *See, e.g., Bacchus Imports,* 104 S.Ct. at 3055–56; *Hunt,* 432 U.S. at 352–53, 97 S.Ct. at 2446–47.

**23.** Section 7001 of the Delaware Coastal Zone Act sets out the purpose of the Act. The Section reads in full:

It is hereby determined that the coastal areas of Delaware are the most critical areas for the future of the State in terms of the quality of life in the State. It is, therefore, the declared public policy of the State to control the location, extent and type of industrial development in Delaware's coastal areas. In so doing, the State can better protect the natural environment of its bay and coastal areas and safeguard their use primarily for recreation and tourism. Specifically, this chapter seeks to prohibit entirely the construction of new heavy industry in its coastal areas, which in-

dustry is determined to be incompatible with the protection of that natural environment in those areas. While it is the declared public policy of the State to encourage the introduction of new industry into Delaware, the protection of the environment, natural beauty and recreation potential of the State is also of great concern. In order to strike the correct balance between these 2 policies, careful planning based on a thorough understanding of Delaware's potential and her needs is required. Therefore, control of industrial development other than that of heavy industry in the coastal zone of Delaware through a permit system at the state level is called for. It is further determined that offshore bulk product transfer facilities represent a significant danger of pollution to the coastal zone and generate pressure for the construction of industrial plants in the coastal zone, which construction is declared to be against public policy. For these reasons, prohibition against bulk product transfer facilities in the coastal zone is deemed imperative.

7 Del.C.Ann. § 7001 (1983).

L.Ed.2d 336 (1979), the Court held violative of the Commerce Clause the application of a nondiscriminatory *ad valorem* state property tax to shipping containers owned by Japanese shipping companies and used in foreign commerce. Two basic considerations underlay the decision. First, there was. an enhanced risk of multiple taxation since full apportionment could not be ensured given that one of the taxing entities was a foreign sovereign. *Id.* 441 U.S. at 451, 99 S.Ct. at 1823. Second, the state tax prevented the Nation from "speaking with one voice" in regulating foreign trade, as it was contrary to an international convention, created asymmetrical international maritime taxation, and could subject foreign owners to various degrees of multiple taxation if other states enacted such provisions. *Id.* at 452–53, 99 S.Ct. at 1823–24. These concerns do not arise in the present case. *See also* Maltz, *supra* note 12 at 49 n. 8 (noting separate methodology for tax cases).

In *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), the Court held Congress did not authorize Alaska's requirement that timber taken from state lands be processed within the State prior to export. A plurality of the Court went on to hold that the requirement, because of its protectionist nature and consequent burden on commerce, fell subject to the rule of virtual *per se* invalidity of laws that "bloc[k] the flow of interstate commerce at a State's borders." 104 S.Ct. at 2247 (quoting *City of Philadelphia*, 437 U.S. at 624, 98 S.Ct. at 2535). Their conclusion was "buttressed" by the fact that foreign commerce was burdened by the restriction. *Id.*

While closer to the present case than is *Japan Lines, South-Central Timber* does not control. The plurality applied the "virtual *per se* rule of invalidity" to the protectionist Alaska statute without regard to burden on foreign commerce. That concern was consistent with the conclusion of

invalidity and supported it, but did not provide its foundation.

 While it may be "a well-accepted rule that state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny," *South-Central Timber*, 104 S.Ct. at 2247, it does not mean a burden on foreign commerce—which could be asserted with regard to many state regulations—automatically triggers the strict scrutiny approach used in *City of Philadelphia* and similar cases. The quoted language from the *South-Central Timber* plurality, at best, suggests that in applying the standard *Pike* balancing test there would be a weakened presumption in favor of upholding the statute.[24] Moreover, in light of the substantial burden on foreign commerce posed by the Alaska regulation, *id.* at 2239 nn. 4 & 5, 2247, if the Court had intended strict scrutiny automatically to apply it likely would have said so.

**B. Defendants' Arguments for Greater Deference**

Defendants argue not only that the Court should not enter summary judgment for plaintiffs, but that it should enter summary judgment in defendants' favor. They contend a highly deferential approach is warranted and that the Delaware CZA satisfies that standard.

**1. Safety Regulation Standard**

Defendants first contend a highly deferential standard of review, like that often applied to highway safety regulation, should be employed. I cannot agree for the fundamental reason that the statute on its face is directed to the environment, not highway safety.

The Supreme Court has applied the *Pike* balancing test to state regulation that, like the Delaware CZA, is designed to protect the environment. *See Clover Leaf,* 449

---

**24.** This approach mirrors that of the plurality in *Kassel,* in which the *Pike* balance was further skewed in favor of validity when considering a

state highway regulation. *See* 450 U.S. at 670–71, 101 S.Ct. at 1316–17.

U.S. 456, 101 S.Ct. 715. *See also Harvey & Harvey,* 600 F.Supp. at 1380–81.

The decision of the Third Circuit Court of Appeals in *American Trucking,* 683 F.2d 787, does not compel the use of a more highly deferential standard in this case.[25] Highway safety regulations, such as the one upheld in *American Trucking,* traditionally have enjoyed a greater degree of deference than other fields of state regulation. *See id.* at 795 n. 6.[26] While defendants contend "no principled reason" exists for not extending the *American Trucking* approach to this case (Dkt. 122 at 66), the Court is unwilling to do so absent authority from the Third Circuit Court of Appeals. The Court will apply the standard *Pike* test in light of its recent use by the Supreme Court in *Clover Leaf.*[27]

### 2. Zoning Regulation

Defendants also assert the Delaware CZA is entitled to a highly deferential standard of review because it is a zoning regulation. The Court agrees that the CZA does more than merely reinforce the anti-

pollution concerns of the Delaware Environmental Protection Law, 7 Del.C.Ann. § 6001 *et seq.* The Act is also intended to "zone-out" bulk transfer facilities and heavy industry in the coastal zone because of their incompatibility with preferred recreational and tourism uses.[28] However, one would not apply a different standard of review to the Delaware CZA simply because it happens to have some zoning regulatory characteristics.

▮▮▮ The authority of the States to enact zoning ordinances under their police powers is clear. *Transcontinental Gas Pipe Line Corp. v. Hackensack Meadowlands Development Commission,* 464 F.2d 1358, 1362 (3d Cir.1972), *cert. denied,* 409 U.S. 1118, 93 S.Ct. 909, 34 L.Ed.2d 701 (1973) (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) ). It is equally clear, however, that a State may not exercise otherwise valid police power where the necessary effect would be to place a substantial burden on interstate commerce. *Id.* (citing

---

**25.** The fact that the panel split on the standard appropriate to the review of the highway safety regulation in *American Trucking* further weakens the applicability of that approach in other contexts.

**26.** Special deference is accorded highway safety regulations on the assumption that the burden of facially evenhanded highway regulations usually falls on in-state as well as out-of-state economic interests, thus providing a political check on unduly burdensome regulations. *Kassel,* 450 U.S. at 675, 101 S.Ct. at 1318 (citing *Raymond Motor,* 434 U.S. at 444 n. 18, 98 S.Ct. at 795 n. 18). It also recognizes that the States bear primary responsibility for constructing, maintaining, and policing their highways, the conditions of which vary from State to State. *Raymond Motor,* 434 U.S. at 444 n. 18, 98 S.Ct. at 795 n. 18. The Court has been generally reluctant to balance safety against commerce. *See, e.g., id.* at 448–51, 98 S.Ct. at 797–99 (Blackmun, J., concurring) (narrowing decision by focusing on illusory nature of alleged safety benefits); *Kassel,* 450 U.S. at 679–87, 101 S.Ct. at .1320–25 (Brennan, J., concurring) and 687–706 (Rehnquist, J., dissenting) (rejecting balance); *see also Brotherhood,* 393 U.S. at 140, 89 S.Ct. at 329 ("It is difficult at best to say that financial losses should be balanced against the loss of lives and limbs of workers and people using the highways.").

**27.** Significantly, the opinion of the Court in *Clover Leaf* was written by Justice Brennan, who specifically objected to a balancing approach in the highway safety regulation context. *See Kassel,* 450 U.S. at 679–87, 101 S.Ct. at 1320–25 (Brennan, J., concurring).

Other cases cited by defendants also predate *Clover Leaf,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). *E.g., Brotherhood,* 393 U.S. 129, 140, 89 S.Ct. 323, 328 (refusing to balance financial burden against safety concern, which was matter for legislature); *Bibb v. Navajo Freight Lines,* 359 U.S. 520, 523–24, 79 S.Ct. 962, 964–65, 3 L.Ed.2d 1003 (1959) (grouping highway regulation with other categories of regulation, but employing balancing test); *Proctor & Gamble Co. v. City of Chicago,* 509 F.2d 69, 76 (7th Cir.1975) (employing a "compromise between *Brotherhood* and *Pike* " in challenge to city ordinance banning phosphate detergents). To the extent that these cases call for a different standard of review, *Clover Leaf* controls.

While it is possible to piece together language from various opinions to create a syllogistic argument for application here of the most deferential standard of review, *see, e.g., Harvey & Harvey,* 600 F.Supp. at 1381 n. 16, that effort is unavailing.

**28.** *See supra* note 23.

*Southern Pacific Co. v. Arizona,* 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)).

None of the cases cited by defendants compels a more lenient standard for zoning regulations than for other regulations in areas of legitimate state interest.[29] Indeed, to hold in defendants' favor on this point would be to invite states to do under cover of zoning regulation that which they could not do by more straightforward regulation. *See Dean Milk,* 340 U.S. at 354, 71 S.Ct. at 297 (1951) (ordinance not valid "simply because it professes to be a health measure"). In *Transcontinental* the Court of Appeals, while not explicitly citing the *Pike* test, upheld the district court's holding of unconstitutionality after finding that "in determining whether or not an undue burden has been imposed upon interstate commerce" the district court sufficiently had weighed the Commission's justifications for its action. 464 F.2d at 1362.

The Court therefore declines to follow defendants' zoning law argument to adopt a Commerce Clause test even more deferential than the *Pike* test for the Delaware CZA.

## C. The Pike Balance

For the foregoing reasons, the Court will not apply strict scrutiny to the Delaware CZA on the basis of discriminatory effect or burden on foreign commerce as alleged by plaintiffs. Defendants' attempt to win especially great deference, by analogizing to highway safety regulation and characterizing the statute as a zoning regulation, is also unconvincing. Although strict scrutiny might eventually be applied if plain-

tiffs prove discriminatory intent, *see supra* pp. 1237–38 the Court will discuss here the application of the *Pike* balancing test. Both plaintiffs and defendants claim they will prevail on summary judgment under this test.

For purposes of these cross-motions, it will be assumed the Delaware CZA "regulates evenhandedly to effectuate a legitimate local public interest," with only "incidental" effects on interstate commerce. The remaining question under *Pike* is whether the ban on bulk product transfer facilities imposes a burden on commerce "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. "[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

Plaintiffs outline a substantial catalogue of burdens that allegedly result from the ban on vessel-to-vessel lightering. *See* Dkt. 120 at 65–69. By prohibiting coal top-off operations at Big Stone Anchorage, the only viable site, the Delaware CZA precludes the most efficient means of exporting coal. *Id.* at 66. The top-off service would reduce the per unit transportation costs of U.S. coal, making it more competitive on the world market. *Id.* at 67. Plaintiffs estimate that an additional three million tons of coal could be exported each year if topping-off is permitted, with a possible consequent addition of more than $150 million to the U.S. balance of pay-

---

**29.** In *Kroeger v. Stahl,* 248 F.2d 121 (3d Cir. 1957), the Court of Appeals prior to *Pike* upheld a zoning regulation that prohibited plaintiff from constructing a radio tower. Language cited by present defendants here dealt with whether the ordinance was an improper exercise of police power. *Id.* at 123. On the separate Commerce Clause issue, the Court noted that the restrictions "are not directed toward the regulation of commerce" and held that the incidental effects on commerce "are not so repugnant to the right or power to regulate interstate commerce as to constitute an unwarranted invasion." *Id. See also supra* note 13 regarding use of direct/indirect burden test.

In *Al Turi Landfill, Inc. v. Town of Goshen,* 556 F.Supp. 231 (S.D.N.Y.1982), *aff'd,* 697 F.2d 287 (2d Cir.1982), the court upheld local restrictions on landfills after directly quoting the *Pike* test and finding that the ordinances in question were evenhanded and effectuated a substantial local interest. Defendants also cite *Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), which is wholly irrelevant to the present issue. *See also Pittston Warehouse Corp. v. City of Rochester,* 528 F.Supp. 653 (W.D. N.Y.1981) (invalid *per se* rule applied).

ments. *Id.* at 68. Use of supercolliers is likely to increase employment at coal mines, on railroad lines, and at East Coast ports. *Id.* Finally, plaintiffs cite the direct loss they themselves would suffer due to the lightering prohibition, in both past expenditures and foregone revenue. *Id.* at 69.

■■■■ There appears to be no real dispute that a coal top-off operation would reduce coal export costs to some extent and thereby enhance commerce in at least a generalized sense. The Delaware CZA, by prohibiting bulk product transfer facilities, therefore burdens commerce. Inherent in the *Pike* balancing test, however, is a requirement that the Court quantify the burden associated with the regulation at issue. On this level disputes concerning the effect

of the Delaware CZA do exist, making summary judgment inappropriate.[30] An approximation by this Court as to the actual burden must await trial, if one is necessary.

Even if the extent of the burden were clear, however, summary judgment could not be granted under a *Pike* analysis because the "putative local benefits," 397 U.S. at 142, 90 S.Ct. at 847, against which the burden on commerce must be weighed, are in sharp dispute.[31]

Although defendants urge the Delaware CZA is not simply an anti-pollution measure, and that plaintiffs' project should not be considered in isolation, disagreement as to the benefits of the statute has centered on the environmental impact of plaintiffs'

**30.** *See* Dkt. 138 at 43–48. For present purposes, it is enough that the parties disagree as to the cost savings directly attributable to a coal lightering operation. *See id.* at 45–46. The Court need not decide at this juncture to what extent it can or should look beyond this direct burden to consider defendants' arguments based on the probable price responses of plaintiffs' foreign competitors in the coal market or more general economic variables such as fluctuations in the value of the dollar and oil prices. While these additional factors make the balancing task more cumbersome, the Court is inclined to view at least some of them as relevant to the extent of the burden on commerce. The Court must have some basis for deciding whether the burden is "insubstantial" (as defendants claim) or "tremendous" (as plaintiffs claim). In any event, plaintiffs cannot expect to point to their estimates of increased exports, positive implications for U.S. balance of payments, additional employment, and the like without defendant having the right to contest them.

Defendants' assertion that the Delaware Bay "is not the only viable location for a coal top-off service," Dkt. 138 at 43, is not substantiated and so cannot suffice to create a genuine issue. Plaintiffs allege, and defendants do not dispute, that other sites are uneconomically distant from coal mines and coal ports or are otherwise unsuitable. *See* Childress Aff. ¶ 22, Ex. H, Dkt. 120A at A315. The dredging of an East Coast port to accommodate supercolliers is recognized as an alternative, but one that is several years off at best. *See, e.g.,* Dowd Aff. ¶ 25 (Dkt. 120A).

The Court also holds, contrary to defendants' contentions, that the prospective nature of the alleged burden does not itself lessen the burden on commerce. Otherwise, plaintiffs would actually have to violate the prohibition in order to test it fully in court. To the extent that it is

speculative and uncertain, however, the burden cannot support grant of a summary judgment motion and must be resolved at trial.

**31.** The *Pike* Court's use of the phrase "putative local benefits" does not mean this Court must accept at face value the Delaware legislature's assertion of benefits accruing under the statute. *See Kassel,* 450 U.S. at 670, 101 S.Ct. at 1316; *Cottrell,* 424 U.S. at 375–81, 96 S.Ct. at 929–32; *Pike,* 397 U.S. at 144–45, 90 S.Ct. at 848–49; *see also Lewis,* 447 U.S. at 37, 100 S.Ct. at 2016 ("The principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects."). *Cf. Kassel,* 450 U.S. at 679–87, 101 S.Ct. at 1320–25 (Brennan, J., concurring) (highway safety context); *id.* at 687–706, 101 S.Ct. at 1324–34 (Rehnquist, J., dissenting) (same). However, if plaintiffs wish to challenge the Delaware General Assembly's goals stated in the CZA as pretextual they "must come forward to show that the claimed benefits are illusory." *Harvey & Harvey,* 600 F.Supp. at 1380–81; *see also Delaware Accessories Trade Ass'n v. Gebelein,* 497 F.Supp. 289, 196 (D.Del.1980). In short, deference is due the state's legislative policy benefits, but perhaps not to the high degree urged by defendants.

Defendants concede that summary judgment is unavailable under the *Pike* test if the Court must look behind the "putative local benefits," *Pike,* 397 U.S. at 142, 90 S.Ct. at 847, to determine the actual effects of the Delaware CZA. Dkt. 138 at 48.

Further, "[l]ess deference to the legislative judgment is due … where the local regulation bears disproportionately on out-of-state residents and businesses." *Kassel,* 450 U.S. at 675–76, 101 S.Ct. at 1318–19.

proposed project. There appears to be no real dispute, though plaintiffs occasionally claim otherwise, that the proposed coal lightering operation would emit or spill some pollutants. The dispute concerns the magnitude of its effect on the environment. *Compare, e.g.,* DNREC Study at ii; Dkt. 120B at App. to Ex. N (252 tons of coal dust into Delaware Bay annually if transfer three-million tons; coal routinely spilled; measurable air quality degradation), *with* Axetell Aff., Dkt. 120B at A329–49 (1.5 tons per 3 million tons transferred); Cowerd Aff., *id.* at A350–70 (0.0006 pounds/ton emission rate); Meyer Aff., *id.* at A371–438 (1 ton per 3 million tons transferred); Baummer Aff., *id.* at A553–98 (not a significant source of toxic pollutants); Bender Aff., *id.* at A612–51 (little effect on oysters). *See also* French Aff., Dkt. 138B at DA68–69 (Meyer test in Alabama not applicable to Delaware Bay); Sharp Aff., *id.* at DA71–73 (failure to use "state of the art" analysis and reliance on Meyer test); Dkt. 138 at 53 (plaintiffs failed to consider the cumulative impact of their operations and other bulk product transfers, and the chances for operator error). *But see* Dkt. 145 at 16–31.

On summary judgment it is not the Court's function to untangle the affidavits and decide which experts are more correct. Fugitive dust emissions, coal spillage, and their environmental effects remain in dispute and uncertain. Moreover, putative benefits of the Delaware CZA other than its direct anti-pollution aspect may be more significant and are also disputed. *See infra* note 32.

Under these circumstances, with both benefits and burdens open to dispute, the Court cannot hold that either party is entitled to judgment as a matter of law under the *Pike* test. If a trial is necessary, and plaintiffs fail to prove discriminatory purpose, it will be their burden to show that the burden on commerce is "clearly excessive" when weighed against the local benefits.[32]

### D. Conclusion Absent Congressional Consent

Absent congressional authorization of the Delaware CZA, neither party can obtain summary judgment in this case. Plaintiffs are not entitled to a strict scrutiny analysis of the Delaware statute on summary judgment. Similarly, defendants are not entitled to a highly deferential review. Because genuine issues of material facts are in dispute, neither plaintiffs nor defendants are entitled to summary judgment.

### V. Congressional Consent Analysis

Denial of summary judgment under *Pike* does not end the inquiry. There remains

---

**32.** It may ultimately be critical in this case whether the local interest "could be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. *See also Transcontinental,* 464 F.2d at 1362 n. 14 ("It is important to emphasize that the Commission is not attempting to require the Transco [liquified natural gas] facility to conform to any specific regulation. Rather it is attempting to prohibit construction altogether."). The *Transcontinental* court did not appear to give great weight to the Commission's "slippery slope" argument regarding its inability to restrict further construction absent a favorable ruling in that case. *See id.* at 1363. *But see* Second Aff. of David S. Hugg, III (Dkt. 123) at ¶ 24 (at least two new proposals for transshipment of coal and other commodities have come to attention of DNREC since redesignation of anchorage in 1983); U.S. Coast Guard Environmental Assessment, No. 16475.3/32–82 (May 1983) (Dkt. 120A at Ex. B to Ex. G) at 1 (expansion of anchorage in 1974 and 1982 to accommodate increasing traffic).

Plaintiffs argue in this regard that the pollution control standards of 7 Del.C.Ann. ch. 60 (1983 & 1984 Supp.), make it unnecessary to apply to plaintiffs the absolute ban of the Delaware CZA. They contend that to the extent the Delaware CZA is concerned with non-environmental factors such as aesthetics or onshore development, "these, too, can be advanced in a fashion other than by an absolute prohibition." Dkt. 120 at 72 n. 34.

The Delaware CZA is viewed as more than a simple anti-pollution statute. In light of the issues in dispute, however, and because the "lesser impact" factor strikes at the heart of legislative decisionmaking, the Court will defer further consideration of this matter. *Cf. Baltimore Gas,* 760 F.2d at 1427 (inquiry into nondiscriminatory alternatives precluded where the challenged statute does not discriminate).

for disposition defendants' argument that Congress consented to the State of Delaware's ban on coal lightering within the coastal zone. Defendants urge Congress has consented to Delaware's ban on the proposed coal-transfer operation by its passage of the Coastal Zone Management Act (CZMA). There being no disputed material issues of fact, the only issue is whether, as a matter of law, Congress intended to give its consent. This solely legal issue is ideally suited for summary judgment.

## A. The Congressional Consent Framework

█ In analyzing whether Congress has given its consent for States to legislate in a manner otherwise impermissible under the Commerce Clause, the Court looks first to the text of the federal statute purportedly authorizing state action, *see, e.g., Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946), and thereafter to relevant legislative history for assistance in explicating Congress' meaning, *see Northeast Bancorp v. Board of Governors*, — U.S. —, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), and to administrative regulations. *See White v. Massachusetts Council of Constr. Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983).

█ The congressional power to consent to otherwise impermissible state regulation of interstate commerce must be exercised expressly. *See, e.g., Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 654, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514 (1981) (Congress "explicitly intended" the McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.*, to authorize state taxing and regulatory powers over the insurance business). As the Court has recently observed, however, "[t]here is no talismanic significance to the phrase

'expressly stated'; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear." *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 2242, 81 L.Ed.2d 71 (1984).

By "expressly stated" the Court does not require Congress to explain, either in the body of the statute or in the legislative history, that it is exercising its Commerce Clause power. Thus the McCarran Act approved in *Prudential Insurance*, 328 U.S. 408, 66 S.Ct. 1142, nowhere mentions the Commerce Clause. *See* 15 U.S.C. §§ 1011–1015; *see also* 12 U.S.C. § 1842(d) (Douglas Amendment to the Bank Holding Company Act, construed in *Northeast Bancorp*, — U.S. —, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), as removing all Commerce Clause restraints from state regulation of interstate bank acquisitions).

The issue of congressional consent embraces two questions: (1) Whether, as the State of Delaware contends, Congress by enacting the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*, intended to remove from Commerce Clause scrutiny state coastal zone management statutes funded under the Act; and (2) Assuming the CZMA provides the states such authorization, whether the specific ban on plaintiff's coal-transfer operation is within the scope of that authorization.

## B. The Coastal Zone Management Act of 1972

### 1. The Statutory Framework

Congress in the Coastal Zone Management Act of 1972 found "[t]here is a national interest in the effective management, beneficial use, protection, and development of the coastal zone,"[33] 16 U.S.C. § 1451(a)

---

33. The CZMA defines the coastal zone as the coastal waters (including the lands therein and thereunder) and the adjacent shorelands (including the waters therein and thereunder), strongly influenced by each other and in proximity to the shorelines of the several coastal states, and includes islands, transition-

al and intertidal areas, salt marshes, wetlands, and beaches.... The zone extends inland from the shorelines only to the extent necessary to control shorelands, the uses of which have a direct and significant impact on the coastal waters. Excluded from the coastal zone are lands the use of which is by law

(1982), and declared "it is the national policy to preserve, protect, develop, and where possible, to restore or enhance, the resources of the Nation's coastal zone...." *Id.* § 1452(1). Congress observed "[t]he increasing and competing demands upon the lands and waters of our coastal zone occasioned by population growth and economic development, including requirements for industry, commerce, residential development, recreation, extraction of mineral resources and fossil fuels, transportation and navigation, waste disposal, and harvesting of fish, shellfish, and other living marine resources," *id.* § 1451(c), and found "inadequate" existing state and local arrangements for planning and regulating coastal land and water use. *Id.* § 1451(h).

To achieve its policy objective, Congress entrusted to the coastal states the primary responsibility for developing and administering coastal zone management programs. The States were to be given federal grants as an incentive to take on this task. Congress insured that its federal goals would be met by requiring active approval and oversight of the state programs by the Secretary of Commerce.

Congress amended the CZMA in 1976 to help the States deal with problems resulting from increased energy-related activities in the coastal zone. *See Legislative History* at 577–78. Congress found that "growing energy facility requirements and the imminent construction of deepwater ports ... add to the challenge of bringing rational management to the coastal zone." S.Rep. No. 277, 94th Cong., 1st Sess. 10 (1975), *reprinted in Legislative History* at 736, U.S.Code Cong. & Admin.News 1976, pp. 1768, 1777. The Amendment left intact the existing framework of the original Act, but provided increased funding and required the States to take into account the siting of energy facilities in assessing the "national interest." Pub.L. No. 94–370,

§§ 4, 5(3) (1976), amending 16 U.S.C. §§ 1454, 1455(c)(8).

The CZMA was amended again in 1980. The new amendment made more specific the national policy objectives of the Act,[34] but the Congress noted that these additions were intended as "clarification[s]" and not as new program requirements. *See* H.Rep. No. 1012, 96th Cong., 2d Sess. 16 (1980), *reprinted in* 4 U.S.Code Cong. & Ad.News 4362, 4364 (1980). The House Report reaffirmed Congress' commitment "to preserve, protect, develop and where possible, to restore or enhance the resources of the Nation's coastal zone," *id.*, and "reemphasize[d] its belief that the nation can provide the needed protection of our fragile coastal resources while at the same time continuing to expand and develop in those areas suited for development." *Id.*

### a. Duties of the States

Under the CZMA, coastal states may apply for grants to develop coastal management plans, 16 U.S.C. § 1454(a)(1); to complete the development and assist in the initial implementation of the plans, *id.* 1454(a)(2); and to administer the plans. *Id.* § 1455.[35] A coastal state that has completed the development of its management program submits the program to the Secretary for review and approval under Section 1455. *Id.* § 1454(h).

Each state's coastal management program is to set forth "objectives, policies, and standards to guide public and private uses of lands and waters in the coastal zone." *Id.* § 1453(12). Congress required each state's management program to meet a number of substantive requirements. The program must, *inter alia,* define permissible land and water uses within the zone; designate areas of particular concern; establish guidelines on priorities of

---

subject solely to the discretion of or which is held in trust by the Federal Government, its officers or agents.
16 U.S.C. § 1453(1).

**34.** The national policy objectives are contained in 16 U.S.C. § 1452.

**35.** The Secretary is authorized to make a number of other grants to the states under the aegis of the CZMA. *See id.* §§ 1456b, 1456c(b), 1461, 1455a, 1456a.

uses in particular areas; and create planning processes regarding access to beaches, siting of energy facilities, and prevention of shoreline erosion. *Id.* § 1454(b).

### b. Duties of the Secretary of Commerce

Before approving a state's management program the Secretary[36] is required to make a number of findings. The Secretary must find, *inter alia,* the substantive requirements of Section 1454(b) (enumerated *supra*) are met, *id.* § 1455(a); the plan is consistent with the congressionally enunciated declaration of policy, *id.* § 1455(c); and the program provides for adequate consideration of the national interest involved in planning for and siting facilities, including energy facilities, necessary to meet requirements that are other than local in nature. *Id.*[37] The Secretary is required to consider the views of federal agencies principally involved before approving a state coastal management program. *Id.* § 1456(b).[38]

If the Secretary approves a state's coastal management program, the Secretary is authorized to make annual grants for the state's administration of the program. *Id.* § 1455(a). After the initial approval of a state's coastal management program, the Secretary "shall conduct a continuing review of the performance of coastal states with respect to coastal management." *Id.* § 1458(a). The Secretary must provide a

written evaluation assessing and detailing, *inter alia,* the state's implementation and enforcement of its coastal management program, and the state's manner of addressing the congressional policy declarations.[39] *Id.*

If the Secretary determines a "coastal state is failing to make significant improvement in achieving the coastal management objectives," the Secretary is to reduce any financial assistance received by the state for administration of its program. *Id.* § 1458(c). Should the Secretary find the state is failing to adhere to its approved management plan without justification, the sanction is more serious: The Secretary shall withdraw federal approval of a state's entire coastal management program and all financial assistance available to the state under title 16.[40] *Id.* § 1458(d).[41]

The Secretary is required to report biennially to Congress on the administration of the CZMA. *Id.* § 1462(a). The report must include, *inter alia,* a description of each participating state's program and accomplishments; a statement of reasons for the disapproval of any state program reviewed; a summary of the continuing review over state programs and of any sanctions applied; a listing of all activities and projects found inconsistent with an approved state coastal management program; a summary of a coordinated national strategy and program for the nation's coastal

---

**36.** The Secretary's authority under the CZMA to approve state plans has been delegated to the Assistant Administration for Coastal Zone Management in the National Oceanic and Atmospheric Administration. 15 C.F.R. § 923.2(b) (1985). For convenience, the opinion shall refer only to the Secretary as responsible for approving state plans.

**37.** The Secretary must also find the state has held public hearings on the program; the Governor has reviewed and approved the program and has designated a single agency to receive and administer federal coastal-zone grants; the state has the requisite authority and organizational capacity to manage the program; and the program provides procedures for preserving or restoring specific areas. *Id.* § 1455(c).

**38.** *See also id.* § 1456(a) (requiring approval by the Secretary of the Interior prior to approval

by Secretary of Commerce of state coastal management program that may affect land subject to any national land-use program).

**39.** The congressional policy directives are specified in 16 U.S.C. § 1452(2)(A) through (I).

**40.** Section 1458(d) specifies "[t]he Secretary shall withdraw ... any financial assistance available to th[e] state under this title," indicating this forfeiture is to extend more broadly than simply to the CZMA funding provisions of chapter 33 of title 16, which deals with conservation.

**41.** This sanction also applies if the Secretary finds the state is failing to adhere to the terms of any other funding grant under the CZMA. *Id.* § 1458(d).

zone; and a description of the economic, environmental, and social consequences of energy activity affecting the coastal zone. *Id.·*

### 2. Congressional Authorization Under the CZMA

Although Congress set national policy goals in the CZMA, it did not enact a comprehensive statute detailing a coastal-management plan for the vast coastal area of the United States. Instead, Congress intended each state to draw up a plan for its own coastal area. As the Senate Report explains, the Act "has as its main purpose the encouragement and assistance of the States in preparing and implementing management programs." S.Rep. No. 753, 92d Cong., 2d Sess. (1972) (hereinafter cited as S.Rep. No. 753), *reprinted in Legislative History* at 193, U.S.Code Cong. & Admin.News 1972, p. 4776.[42]

Congress feared local zoning boards, which were often the only existing land-use planning agencies, would not adequately safeguard this national interest,[43] yet rejected the idea that "there should be only one policy and one system of management." S.Rep. No. 753, *reprinted in Legislative History* at 196, U.S.Code Cong. & Admin.News 1972, p. 4778. "[E]xperience

has shown us that in order to achieve adequate manageability, diverse systems are often needed." *Id.* Congress decided to make the states, instead of local governments or the federal government, "the focal point for developing comprehensive plans and implementing management programs for the coastal zone." *Id.* at 197, U.S.Code Cong. & Admin.News 1972, p. 4780. Thus 16 U.S.C. § 1451(i) reads in part, "The key to more effective protection and use of the land and water resources of the coastal zone is to encourage the states to exercise their full authority over the lands and waters in the coastal zone...." [44]

The entire thrust of the Act is for each state to resolve for its own coastal area the basic choices among competing uses for finite resources. The statute is "to encourage and assist the states ... to achieve wise use of the land and water resources of the coastal zone." 16 U.S.C. § 1452(2). When the Act was amended in 1980, this intent was made even clearer: Congress found "the need for resolution of serious conflicts among important and competing uses and values in coastal and ocean waters." *Id.* § 1451(f).

Congress understood that the choices made by the states would affect commercial interests. Congress directed the states

---

**42.** The extensive duties the statute imposes on the Secretary and on the States that submit coastal management plans belie plaintiffs' assertion that the CZMA is properly characterized as merely a grant statute. To the extent the CZMA dispenses federal money, it was enacted pursuant to Congress' power under the Spending Clause, U.S. Const. art. 1, § 8, cl. 1. However, Congress may exercise its spending power in combination with its commerce power. *See White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983).

**43.** The Senate Report quoted from the Commission on Marine Science, Engineering and Resources, *Our Nation and the Sea* 1969:

The uses of valuable coastal areas generate issues of intense State and local interest, but the effectiveness with which the resources of the coastal zone are used and protected often is a matter of national importance. Navigation and military uses of the coasts and waters off-shore clearly are direct Federal re-

sponsibilities: economic development, recreation, and conservation interests are shared by the Federal Government and the States.

Rapidly intensifying use of coastal areas already has outrun the capabilities of local governments to plan their orderly development and to resolve conflict. The division of responsibilities among the several levels of government is unclear, and the knowledge and procedures for formulating sound decisions are lacking.

S.Rep. No. 753, *reprinted in Legislative History* at 195, U.S.Code Cong. & Admin.News 1972, p. 4778.

**44.** Plaintiffs argue this statutory passage establishes Congress was not authorizing the States to exercise any new powers over commerce or any other area entrusted to the federal government. Although this reading is facially plausible, it is not supported by the legislative history. As the discussion in the text above reveals, Congress in this passage was affirming that authority over the coastal zone should be centered on the states, as opposed to local governments.

to consider commercial and industrial activities as well as recreational and ecological uses in drawing up their coastal-zone management plans. *See id.* § 1452. The congressional findings note that the coastal zone contains, *inter alia,* commercial and industrial resources, 16 U.S.C. § 1451(b); and that economic development, including requirements for industry and commerce, is placing increasing demands on the coastal zone. *Id.* § 1451(c). The Senate Report stated that "most of our great commercial and industrial development is taking place in or near the coastal zone. Additionally, the coastal zone is a politically complex area, involving local, State, regional, national and international political interests." S.Rep. No. 753, *reprinted in Legislative History* at 196, U.S.Code Cong. & Admin. News 1972, p. 4779.

The national goals set forth in the CZMA reflect congressional concern that commercial and industrial uses not be given automatic priority over recreational and ecological uses. *See* 16 U.S.C. §§ 1451–52. To the contrary, Congress believed the states were giving inadequate consideration to noneconomic factors relating to coastal-zone development. As the Senate Report noted, "there have been numerous examples of commercial development within the coastal zone taking precedent [sic] over protection of the land and waters of the coastal zone.... Local government needs financial, planning, political, and other assistance to avert damage to natural values in the coastal zone." S.Rep. No. 753, *reprinted in Legislative History* at 196–97, U.S.Code Cong. & Admin.News 1972, p. 4779. By telling the states to "giv[e] full consideration to ecological, cultural, historic, and esthetic values as well as to needs for economic development," 16 U.S.C. § 1452(2), Congress was saying a state may legitimately choose recreational use over industrial use.

Although the 1976 Amendments to the Act reflected increased congressional concern with energy self-sufficiency, Congress did not jettison its emphasis on preservation of the coastal zone. The Senate Committee Report on the 1976 Amendments

described in detail a number of specific situations in which energy development threatened the ecology of the coastal zone. *See* S.Rep. No. 277, at 10–19, *reprinted in Legislative History* at 736–745. The Report cited with approval a coastal plan developed by the Shetland Islands, in Scotland, which is similar to the Delaware plan in that it banned onshore industrial development from all but a single site. S.Rep. No. 277, at 16–17, *reprinted in Legislative History* at 742–43. The same Report also noted specifically that Delaware had banned heavy industry from its coastal area. S.Rep. No. 277, at 6, *reprinted in Legislative History* at 732. The 1980 Amendments likewise indicate that congressional concern for protection of natural resources retained primary importance. *See* H.Rep. No. 1012, *supra,* at 16, *reprinted in* 4 U.S.Code Cong. & Ad.News 4364 (1980).

■ An analysis of the entire statutory scheme compels the conclusion that Congress intended the states to resolve choices among competing uses in a manner that might otherwise be subject to Commerce Clause challenge. Congress deliberately and repeatedly spoke of "choices" to be made by the states after "balancing" environmental and developmental concerns and priorities, and indeed, of forbidding entirely some potential uses. *See, e.g.,* 16 U.S.C. § 1454(b)(2), (4). This entire statutory framework would become a nullity if the traditional Commerce Clause concern with breaking down barriers to commerce remained paramount.

Nevertheless, Congress inserted within the CZMA a strong safeguard for the federal interest. To insure generally that the state coastal management plans comported with the national goals of conserving the coastal zone and of promoting orderly development, Congress specifically directed the Secretary of Commerce to approve each state's plan before the state could receive federal funding. *See* 16 U.S.C. § 1455.

The CZMA requires the Secretary, in the course of approving state's coastal zone

management program, to find the plan "provides for adequate consideration of the national interest involved in planning for, and in the siting of, facilities (including energy facilities in, or which significantly affect, such state's coastal zone) which are necessary to meet requirements which are other than local in nature." 16 U.S.C. § 1455(c)(8).

Although the "national interest" is not defined by the statute, a fair reading of the statute compels the Court to interpret the "national interest" as the national interest in the specific activities Congress directed the states to consider in drawing up their management plans—which includes commercial activities. This reading is bolstered by examining the relevant legislative history.

The House Report on the CZMA explained in some detail this provision of the statute. The Report stated that the Act did not relinquish any federal constitutional powers, "including those relating to interstate and foreign commerce...." H.Rep. No. 1049, 94th Cong., 2d Sess., *reprinted in Legislative History* at 322. Although plaintiffs seize on this statement as incontrovertible proof that Congress was not exercising its Commerce Clause powers, taken in context the statement shows the very opposite. The Report continues: "To the extent that a State program does not recognize these overall national interests, ... the Secretary may not approve the State program until it is amended to recognize those Federal rights, powers, and interests." *Id.*

This explanation in the House Report confirms that the "national interest" the Secretary was to take into account in approving a state plan includes, in particular, commerce. The Secretary's approval of a state program constitutes a finding that the program comports with the national interest as defined by Congress in the CZMA.

 Plaintiff also argues that Congress' directive to the Secretary to consider the national interest, even if it includes Commerce Clause concerns, requires the Secretary to consider process only, not substance. The Secretary's interpretation of the statute, however, indicates that substance is to be considered. The regulations promulgated by the Secretary explain in detail how the states are to meet their requirement to consider the national interest:

States must:

(1) Describe the national interest in the planning for and siting of facilities considered during program development.

(2) Indicate the sources relied upon for a description of the national interest in the planning for and siting of the facilities.

(3) Indicate how and where the consideration of the national interest is reflected in the substance of the management program. In the case of energy facilities in which there is a national interest, the program must indicate the consideration given any interstate energy plans or programs, developed pursuant to section 309 of the Act, which are applicable to or affect a State's coastal zone.

(4) Describe the process for continued consideration of the national interest in the planning for a siting of facilities during program implementation, including a clear and detailed description of the administrative procedures and decisions points where such interest will be considered.

15 C.F.R. § 923.52(c) (1985). The above regulations make very clear that a state must do more than merely indicate the "national interest" has been considered in its program; it must, *inter alia*, "[i]ndicate how and where the consideration of the national interest is reflected in the *substance* of the management program." (emphasis added). Under the regulations, the Secretary looks to the content of the national interest, not simply the procedures used by the State to consider that interest. Plaintiffs' argument that the Secretary is charged to consider only process, and not substance, in deciding whether a state has provided adequately for the national interest is thus belied by the regulations.

■ The view of the agency charged with administering a statute is entitled to considerable judicial deference. A court need find only that the agency's understanding of the statute is a sufficiently rational one to preclude it from substituting its judgment for that of the agency. *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *see also Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 1479, 1485, 43 L.Ed.2d 731 (1975). The regulations here are entitled to judicial deference as a rational interpretation of the "national interest" which is not contrary to the clearly expressed intent of Congress. *See Chemical Mfrs. Ass'n,* 105 S.Ct. at 1108.

In enacting the CZMA Congress was acting, in part, pursuant to its constitutional power under the Commerce Clause. The CZMA thus embodies a congressional exercise of the Commerce Clause power translated into a set of congressionally mandated policies over the coastal zone. Congress funds only those plans that comport with the national interest, and therefore requires the Secretary of Commerce to approve state plans. The Secretary's approval is not a rubber stamp, but is subject to statutory requirements.

The consent mechanism set up by Congress is more complex than the blanket congressional consent given to state insurance laws, *see Prudential Insurance,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed.2d 1342 (1946), or to state laws governing interstate bank acquisitions. *See Northeast Bancorp,* —— U.S. ——, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985). This complexity is not fatal, however; Congress is entitled to exercise its plenary Commerce Clause power as it sees fit and is not restricted to choosing between consenting to all state coastal zone laws or to none.

Plaintiffs contend this reading of the CZMA allows the unconstitutional delegation of authority by Congress to the Secretary to make a finding on the Commerce Clause. Plaintiffs confuse a very basic point. The Secretary in carrying out his duties under the CZMA is acting pursuant to a statute that confines his discretion. As the Supreme Court observed in *Carlson v. Landon,* 342 U.S. 524, 542, 72 S.Ct. 525, 535, 96 L.Ed. 547 (1952), "Congress can only legislate so far as is reasonable and practicable, and must leave to executive officers the authority to accomplish its purpose." Congress' policy statements, definitions, and requirements, particularly in 16 U.S.C. §§ 1452, 1453, and 1455, provide sufficient standards to limit executive judgment and therefore the legislation is constitutionally permissible. *See Carlson v. Landon,* 342 U.S. at 544, 72 S.Ct. at 536.[45] Moreover, plaintiffs overlook the Supreme Court's decision in *White v. Massachusetts Council of Construction Employees,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). The federal statute in *White* was entirely silent on the challenged mayoral order requiring 50% of construction workers on certain federally funded construction projects in Boston to be Boston residents. The Court found the mayoral order "sound[ed] a harmonious note" with "the federal regulations for each program [which] affirmatively permit the type of parochial favoritism expressed in the order." *Id.* 460 U.S. at 213, 103 S.Ct. at 1047. The Court concluded that this administrative regulation constituted express congressional consent. *Id.*

■ The Secretary of Commerce first approved the Delaware coastal zone management plan in August, 1979. Included within the plan was the specific statu-

---

**45.** Plaintiffs also look to *Granite Rock Co. v. California Coastal Commission,* 768 F.2d 1077 (9th Cir.1985), to support their argument that the CZMA does not authorize the States to regulate in a manner otherwise impermissible under the Commerce Clause. *Granite Rock* is wholly inapposite to the present case, however. At issue was whether the CZMA authorized state regulation pertaining to federal lands. No such issue is present before this Court. Moreover, the *Granite Rock* court did not use a Commerce Clause analysis but focused on the question of federal preemption using a Supremacy Clause analysis. *See Granite Rock* at 1080.

tory provision to which plaintiffs object. The Secretary has subsequently made three reviews of the Delaware plan, in 1980, 1982, and 1984, and has continued to approve it. Based upon the regulations and the Secretary's periodic approval of the Delaware plan, the requirement of express congressional consent is met.

## C. The Delaware CZA

█ Nevertheless, plaintiffs continue to insist the Secretary has not approved the interpretation of Delaware's statutory ban on bulk product transfer facilities to include a ban on plaintiffs' proposed coal-transfer operations. This argument is without merit. The Delaware CZA defines "bulk product transfer facility" as

any port or dock facility, whether an artificial island or attached to shore by any means, for the transfer of bulk quantities of any substance from vessel to onshore facility or vice versa. Not included in this definition is a docking facility for which a permit is granted or which is a nonconforming use. Likewise, docking facilities for the Port of Wilmington are not included in this definition.

*Id.* § 7002(f).

In the report approving the Delaware plan, the Secretary commented explicitly on the Delaware ban. The Secretary stated that the policies of the Delaware plan

focus on the protection of valuable coastal resources while recognizing the need to accommodate economic growth and to judiciously allow competing use of coastal resources. Thus, while certain heavy industrial uses are prohibited from the Coastal [Zone], they are allowed in other parts of the State. Also, within the Coastal [Zone], bulk product transfer facilities are restricted to the Port of Wilmington, so that any adverse effect on valuable natural resources will be miti-

gated while allowing such facilities which are of national interest.

Findings of R.W. Knecht, Ass't Admin. for Coastal Zone Management, NOAA, Approval of the Delaware Coastal Management Program at 12 (Aug. 21, 1979), *contained in* Dkt. 132A, at 659, 672.

Plaintiffs insist the above discussion by the Secretary demonstrates he did not understand the bulk product transfer ban to include a ban on vessel-to-vessel coal lightering. Plaintiffs point out that vessel-to-vessel coal lightering cannot be carried out in the Port of Wilmington and thus it would be meaningless for the Secretary to say that vessel-to-vessel coal lightering is among the "bulk product transfer facilities ... restricted to the Port of Wilmington."

█ Plaintiffs mistake the scope of the Secretary's approval. Once the Secretary has approved a state's plan, that approval continues indefinitely, until the Secretary next reviews the plan. *See* 16 U.S.C. § 1458. Having been approved, Delaware's plan bears the imprimatur of Congress that the national interest in commerce has been accorded due consideration. At the time of the continuing review, the Secretary is free, subject to constraints not applicable here, to withdraw approval from unsatisfactory state plans. The continuing-review mechanism thus allows the Secretary to ensure that state administrative and judicial interpretations of the state statute remain consistent with national policy goals.

The Delaware Supreme Court decision interpreting the Delaware CZA's ban on bulk product transfer facilities to include plaintiffs' proposed coal top-off service was handed down in 1985. *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242 (Del.1985). The Secretary has not reviewed the Delaware program since the time of that decision. If, as plaintiffs assert, the State's plan now merits disapproval, they may press this argument before the Secretary.[46] For this Court to

---

46. Of course, the Secretary's decision to approve or disapprove a state plan is subject to judicial review. *See American Petro. Inst. v. Knecht*, 609 F.2d 1306 (9th Cir.1979) (per curiam) (using "arbitrary and capricious" standard of review for Secretary's approval of state coastal management plan).

step into this process of continuing review before the Secretary has taken any action would circumvent the statutory scheme set up by Congress.

The Department of Commerce through the Justice Department is present in this action as an amicus curiae in support of the position of plaintiffs. A group of United States Senators and Representatives has also filed an amicus curiae brief in support of plaintiffs. In large part, both briefs urge that the Delaware prohibition on bulk-product transfer facilities, and specifically the ban on the proposed coal top-off service, contravenes the national interest of the United States in promoting coal exports.

Assuming *arguendo* the Delaware prohibition does contravene our national coal-export policy, plaintiffs' position is not furthered. In enacting the CZMA Congress recognized there would be conflict between competing activities. The states in the first instance are to balance the merits of the activities and, to the extent necessary, choose among them. The Secretary in conducting the review and then again in the continuing reviews may disapprove those choices. The Secretary has not done so here. It is not for the federal judiciary to gainsay congressionally authorized commerce policies on the grounds of the national interest. For a court to declare unconstitutional in a piecemeal fashion a state's approved management plan destroys the integrity of Congress' coastal-management policy. Congress requires the Secretary to balance the merits of the entire plan; thus the appropriate balance is not the national coal-export policy against the allegedly incremental environmental degradation caused by plaintiff's coal top-off service, but the national coal-export policy against the preservation of the Delaware coastal zone as embodied in the Delaware coastal-zone management plan. The Secretary is obligated by statute to carry out this latter balance. Unless the Secretary exercises his power to disapprove the plan, the Court must assume the balance has been struck in favor of the Delaware plan.

Nor is the Court persuaded by the amicus brief submitted on plaintiffs' behalf by a few members of Congress.[47] These Senators and Representatives are in essence urging the Court to overturn congressional policy as enunciated in the CZMA in favor of the national coal-export policy. The proper forum for such a policy change, of course, is the legislature, not the judiciary.

### VI. Conclusion

Through the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 *et seq.*, and the Secretary's approval thereunder of the Delaware Coastal Zone management program, Congress has authorized the developmental restrictions contained within the Delaware Coastal Zone Act. The Delaware CZA is therefore immune from plaintiffs' challenge under the Commerce Clause and summary judgment will be entered in favor of defendants.

While summary judgment has been granted to defendants on the ground that Congress consented to the Delaware CZA, the Court in lengthy dicta discussed the parties' competing Commerce Clause arguments, ultimately denying summary judgment to both plaintiffs and defendants on that ground. The extensive Commerce Clause discussion represents a departure from normal prudential practice in anticipation of an appeal on the congressional-consent issue. *See Synar v. United States*, 626 F.Supp. 1374, 1382 (D.D.C.1986). In the event there should be a remand, the appellate court will have the benefit of this Court's views on a tangled area of Commerce Clause law so as to be able to provide guidance should it choose to do so.

---

**47.** An amicus brief in support of plaintiffs was filed by Senators John W. Warner and Paul S. Trible, Jr., and Representatives Herbert H. Bateman, Frederick C. Boucher, Alan B. Mollohan, Jim Olin, Nick Joe Rahall, II, Norman Sisisky, Harley O. Staggers, Jr., and G. William Whitehurst.

Senators William V. Roth, Jr., and Joseph R. Biden Jr., Representative Thomas R. Carper, and Governor Michael N. Castle filed an amicus brief in support of defendants.

*Cf. Hornsby v. United States Postal Serv.,* 787 F.2d 87, 89 (3d Cir.1986).